Andrew P. INTERDONATO, et
al., Appellants,

v.

Paul F. INTERDONATO, Appellee.

No. 85–373.

District of Columbia Court of Appeals.

Argued Jan. 7, 1986.
Decided Feb. 24, 1987.

John C. Lenahan, Fairfax, Va., with whom W. Gary Kohlman, Washington, D.C., was on the brief, for appellants. Paul F. Sheridan, Washington, D.C., also entered an appearance for appellants.

Leonard C. Collins, with whom Timothy J. Battle, Washington, D.C., was on the brief, for appellee.

Before MACK, FERREN and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellants Antonia Interdonato Giordano and Andrew Interdonato, the widow and son of the late Guy Interdonato, appeal from an order granting appellee Paul Interdonato, an attorney and the brother of Guy Interdonato, summary judgment on all ten counts of their complaint. Appellants' principal claims are that appellee acted improperly as executor of his brother Guy's estate, as a trustee of a testamentary trust, and as an advisor to them, and that he unlawfully altered Guy's will before it was admitted to probate. Appellee categorically denies all of these allegations. We affirm the judgment in part, reverse it in part, and remand the case for further proceedings.

## I

Guy Interdonato died suddenly on April 19, 1953, at the age of thirty-one. His survivors included his widow Antonia and his son Andrew, who was then ten months old.[1] Antonia had come to the United States from Italy in 1951, at the age of nineteen, and could not speak, read, write, or understand English.

After Guy's death, his brother Paul promised Antonia that he would care for her and Andrew. According to Antonia, he also promised that he would serve as her advisor in all legal and business matters. Antonia relied on Paul's advice in conducting her personal, financial, and legal affairs because, she testified,[2] he had assured her that he "would take care of everything," and because she could speak with him in Italian and had no reason to doubt his good faith. Paul likewise testified that he had told Antonia he would take care of her needs.

Before his death, Guy had executed a will prepared by his attorney, Philip Rosenfeld. Guy told Antonia that he had drawn up a will, and that she would have no financial worries if he should die because he had left everything to her. A week or two after Guy's death, Mr. Rosenfeld brought a copy of the will to Antonia's home and left it with her. Since she could not read English, she asked Paul to read it and tell her what it said. Paul's account of what the will provided did not comport with what Guy had told her before he died. A few months later, Antonia testified, Paul told her that he had paid someone $1,000 to "get" the will and make a change in it, that

---

1. Because all the parties, including the decedent, share the same last name, we shall generally refer to them by their first names throughout this opinion.

2. Our summary of the facts is based on several depositions that were taken in this case and a prior case. When we refer in this opinion to the testimony of any witness, the reference will be to one or more of those depositions, all of which were before the trial court when it made its ruling.

he had changed it, and that "it was just a little bit different" from the way it was originally written. Paul then changed the subject of the conversation.

The will admitted to probate appointed Paul Interdonato and Philip Rosenfeld as joint executors of Guy's estate and as co-trustees of a testamentary trust. The principal assets of the estate were two nightclubs on Eighth Street, S.E., known as Guy's Place and the Roundup. The profits from these nightclubs, which were apparently successful business ventures, were kept in a safe in Guy's Place. The will left the businesses to Paul[3] and established a trust for the benefit of Antonia, with a provision that when Andrew reached the age of twenty-one, the trust estate was to be divided, with one-half to go to Andrew and the remainder to remain in trust for Antonia. Small cash bequests were made to other relatives, and Guy's personal effects and household furnishings went directly to Antonia. The residue of the estate was to constitute the corpus of the trust.

Paul operated and managed the nightclubs from Guy's death in April 1953 until the latter part of 1956, but for his own benefit rather than that of the estate. He testified in 1964 that he did not know in 1953 that he was supposed to operate the businesses for the estate and not for himself.

In April 1963 Antonia filed an action against Paul, on her own behalf and as next friend of her son Andrew, in the United States District Court for the District of Columbia. Mr. Rosenfeld was a co-plaintiff, and Paul was the sole defendant. The complaint alleged fraudulent conduct by Paul in his actions as executor, as trustee, and as Antonia's attorney. In it Antonia sought the removal of Paul as trustee; an accounting of all sums of money which had come into his possession since Guy's death,

either individually, as executor, or as trustee, and of any sums which might be due to the estate, to the trust, or to Antonia; and $200,000 in compensatory and punitive damages. Before the case was set to go to trial, Paul paid a visit to Antonia in her home. There he allegedly promised to provide for her and Andrew, to pay her legal expenses, and either to turn over Guy's Place to her at some time in the future[4] or to leave it to Andrew in his will if she would dismiss the case. Weeping, he also told her that he would be put in jail by her lawyer, Jack Bindeman, if the case were to go forward. Antonia then instructed Mr. Bindeman to "stop the case" because she did not want to see Paul go to jail. Although Mr. Bindeman urged her not to drop the suit, it was eventually dismissed in 1966 with prejudice as to Antonia, which she later alleged she did not understand, and without prejudice as to Andrew.

While Andrew was growing up, he would occasionally "hear some things" about his father's great wealth and his uncle Paul's handling of the estate; but because he respected Paul and was intimidated by him, and because his mother would not discuss the subject with him, he never asked Paul about these rumors. When he was about nineteen, however, Andrew hired a law firm to investigate the possibility that Paul had been using money from Guy's trust for his own purposes, thereby depriving Andrew and Antonia of their rightful inheritance. A partner in the firm, Karl Feissner, wrote a letter to Paul questioning the handling of the trust and requesting an accounting. The letter also stated that Andrew and Mr. Feissner had "reviewed with interest the pleadings and depositions that were taken" in the 1963 civil action in the United States District Court.

In March 1972 Mr. Feissner's firm filed suit in Andrew's name in the Circuit Court

---

3. The will stated in pertinent part:
 It is my will that my dear brother, Paul Interdonato, shall be and become the full and sole owner of my said businesses, above described as "Guy's Place" and "The Roundup", as the success of these operations has been, in a large measure, due to his support and coop-

eration with me in their development and success.

4. Antonia testified that Paul told her, "The place is going to be yours. At the moment I cannot give it to you because I am in trouble with the taxes."

of Prince George's County, Maryland, seeking an accounting from Paul for his handling of the testamentary trust.[5] The complaint, which bore Andrew's signature, alleged that Paul was "wasting" the property and "making an improper use" of it. It asked for an appraisal of all real property which had ever been part of the trust corpus, a properly substantiated statement of income and expenses, a complete accounting, and such other relief as the court might find necessary. Andrew testified in 1983 that even though he signed the complaint in 1972, he did not read it and was not aware that the firm was filing suit against Paul.[6] Eventually Andrew became unhappy with the firm's performance and terminated its services. Some time thereafter the suit was dismissed without prejudice and, according to Andrew, without his knowledge.

In 1973 Andrew needed some money to invest in a business venture. He discussed the matter with his accountant, Thomas Murphy, who told him "not to worry about that." Murphy, who was also a friend of Paul, said that Andrew could use the money in his father's estate or obtain a loan by pledging his anticipated inheritance as collateral. Andrew chose to obtain a bank loan for $25,000. When the note came due and Andrew needed the estate funds to pay it off, he went to see Murphy again. Murphy, who had spoken to Paul about the matter "many times," told Andrew that Paul would not give him any money unless he agreed to "drop everything," apparently referring to his suit in the Circuit Court.[7] At first he refused, but because he was in urgent need of the money, Andrew eventually signed a document in Murphy's office—"whatever document it was"—without reading it.

The document was in fact a release discharging Paul from any and all claims with respect to the administration of the trust established under Guy's will. After Antonia signed it also, Andrew and Antonia received a check for $64,000, signed by Paul and drawn on the trust account. The release stated that Antonia and Andrew "understand the contents [of the release] and have executed the same of their own free will." It also provided that Antonia "does hereby waive any and all rights to the corpus of the Trust" and that "the Trustee [Paul] has been under no legal obligation to disburse the corpus of [the] Trust and has undertaken to do so in further consideration of the execution and delivery of this release." Andrew testified that he never received a copy of the release, and that at the time he signed it, he thought it was just a receipt. Antonia testified that the other signature on the release was hers, and the parties have so stipulated, but she had no recollection of signing the release or of discussing it with either Andrew or Paul.

Andrew entered law school in September 1977. He is now a member of the Maryland and District of Columbia Bars.

## II

In November 1982 Antonia and Andrew filed this action in the Superior Court, seeking nullification of the will and a declaration that Guy had died intestate, a reopening of the probate proceedings, recognition of Antonia's right to renounce the will and claim her statutory share of Guy's estate, the creation of a constructive trust for Guy's Place, an accounting by Paul, and compensatory and punitive damages totaling more than thirty-seven million dollars. The complaint, in ten counts, alleged *inter alia* that Paul had breached his fiduciary

---

5. Antonia was not a party to this suit.

6. Andrew testified:

 All I know is I signed a document that the attorney told me to sign. I don't know if I swore to anything. I don't know what it said, and I don't know what it was.
 Q. Did you care what it said?
 A. No. I thought, whatever they were doing, they were representing me. I was paying them $50 or $60 an hour, and whatever they were doing was for my benefit.

 He went on to say that "[t]oday [he] would never do this"; *i.e.,* he would never sign a document without reading it.

7. By this time Andrew had reached the age of twenty-one and was already entitled to receive one-half of the trust fund.

duty as Antonia's attorney and had willfully and fraudulently failed to advise her of her legal right to renounce Guy's will and take her intestate share of Guy's estate (count I); that Paul had breached his fiduciary duty as executor and defrauded Antonia and Andrew by failing to report all of the assets which rightfully belonged to them, had willfully converted those assets to his own use and benefit, and had otherwise failed and refused to act for the benefit of Antonia and Andrew as beneficiaries of the estate (count II); that Paul had breached his fiduciary duty as a trustee of the testamentary trust and had defrauded Antonia and Andrew by converting trust assets to his own use and benefit, and by failing to pay all of the monies due to Antonia and Andrew as beneficiaries of the trust (count III); that Paul had failed to keep certain promises he had made to Antonia to induce her to dismiss the 1963 civil action with prejudice (count IV) and that he had made these promises fraudulently (count V);[8] that Paul had fraudulently altered Guy's will before it was admitted to probate in 1953 (count VI);[9] that Paul had breached his fiduciary duty to the estate, to the trust, and to Antonia and Andrew by operating Guy's Place and the Roundup for his own pecuniary benefit while the estate was being probated but using trust and estate funds to pay the taxes owed on those properties (count VII); that Antonia had never understood her rights regarding the will, so that she should be allowed to renounce the will and elect to take her spousal share (count VIII); that Paul had defrauded Antonia of the income from her one-third interest in a parcel of real property at 428 Eighth Street, S.E., about a block from Guy's Place and the Roundup (count IX); and that Paul had breached his duty to Antonia and Andrew, as beneficiaries of the trust, by refusing to provide an accounting of his management and disposition of the trust assets (count X).

Paul filed an answer denying all of these allegations and then moved for summary judgment. The trial court, after hearing oral argument and reviewing an extensive series of pleadings, issued a fifteen-page order granting the motion on several grounds applicable to various counts of the complaint—*res judicata*, the statute of limitations, laches, the statute of frauds, and the release.

Concerning counts I and VIII, which alleged that Paul had breached his fiduciary duty as Antonia's attorney and had willfully and fraudulently failed to advise Antonia of her right to renounce Guy's will and take her intestate share, the trial court ruled that Antonia's claims were barred under the doctrine of *res judicata*. The court dismissed Andrew's claim in count I (he did not assert a claim in count VIII) on the ground that the right to renounce the will was personal to Antonia.

As to count II and part of count VII, which involved Paul's actions as executor of Guy's estate, the court ruled that Antonia's claims were barred by *res judicata*, and that Andrew's claims were barred by the release, laches, and the statute of limitations.

As to counts III and X and the remainder of count VII, which involved Paul's actions as trustee of the testamentary trust, the court ruled that Antonia's claims accruing before 1966 were barred by *res judicata*. The court further ruled that her claims based on Paul's actions as trustee from 1966 to the present, as well as all of Andrew's claims, were barred by the release, laches, and the statute of limitations.

Concerning counts IV and V, which alleged that Paul had failed to keep the promises he had made to Antonia to induce her to dismiss with prejudice her 1963 action against him, the trial court made several rulings. As to Paul's alleged promise

**8.** The alleged promises were that Paul would provide for Andrew throughout his life, would reimburse Antonia for her legal expenses in the 1963 civil action, and would leave Guy's Place to Andrew upon his death. The complaint further alleged that Paul had told Andrew that he had no intention of giving "all or any part" of Guy's

Place to either Andrew or Antonia. The request for creation of a constructive trust for Guy's Place was based on this last promise.

**9.** At oral argument appellants' counsel told us that this count related primarily to Andrew.

to reimburse Antonia for her legal expenses in that action, the court ruled that Antonia's claims were barred by the statute of limitations and that Andrew had no cause of action against Paul because the promise was personal to Antonia. As to the alleged promise that Paul would provide for both Andrew and Antonia for life, the court held that their claims were barred by the release, the statute of limitations, the statute of frauds, and laches. As to the third promise, that Paul would, upon his death, leave Guy's Place to Andrew, the trial court ruled that Andrew's claim must fail because no such promise was made. Antonia had testified in her deposition that Paul had told her that he would give her "everything you [and Andrew] need as long as you live" and that Guy's Place "is going to be yours." The court noted that "[o]ther than those two alleged promises, Antonia testified that 'I don't remember any others' made by Paul prior to her instructing Mr. Bindeman to dismiss the law suit." To the extent that Antonia might have a claim to an interest in Guy's Place based on the promise that "the place is going to be yours," the court ruled that any such claim was barred by the statute of frauds, the statute of limitations, vagueness, laches, and the release.

The court held that Antonia's claim in count IX that upon Guy's death she was entitled to a one-third undivided interest in the property at 428 Eighth Street, S.E., which the court interpreted as a claim based upon her failure to renounce Guy's will because Paul had never advised her of her right of renunciation, was barred by *res judicata.*

Finally, as to count VI, the court ruled that Antonia's claim that Paul had altered Guy's will before it was admitted to probate was barred by *res judicata,* the statute of limitations, laches, and the release, and that Andrew's claim must fail because Andrew was not a beneficiary under the

alleged terms of the "original" will and therefore had no cause of action.

Summary judgment may be granted only when the pleadings and other items of evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c). "In reviewing on appeal the propriety of a summary judgment, this court must determine whether there is any unresolved issue of fact relevant to the ruling and also whether the trial court correctly applied the substantive law. In carrying out that task, [this court] must view the record in the light most favorable to the party who opposes summary judgment...." *Davis v. Gulf Oil Corp.,* 485 A.2d 160, 164 (D.C. 1984) (citations omitted). Furthermore, "the moving party has the burden to demonstrate the absence of any material factual issue. Any doubt as to whether or not an issue of fact has been raised is sufficient to preclude a grant of summary judgment.... In this connection, the party opposing the motion need show only that there is sufficient evidence supporting the claimed factual issue to require a jury to resolve the parties' differing versions of the truth." *McCoy v. Quadrangle Development Corp.,* 470 A.2d 1256, 1259 (D.C. 1983) (citations omitted). We hold that, for the most part, appellants made a sufficient showing, and that except as to portions of counts IV and V, all of count VI,[10] and Andrew's claim in count I, the trial court erred in granting summary judgment to appellee.

### III

The trial court ruled that Antonia's claims in counts III, VII, and X which arose before the dismissal of her federal court action in 1966, and all of her claims in counts I, II, VI, VIII, and IX, were barred by the doctrine of *res judicata.*[11] We re-

---

**10.** We affirm the trial court's ruling that Antonia's claim in count VI was barred by laches. We hold that the trial court erred in dismissing Andrew's claim in count VI on the ground that he had no cause of action, but we further hold

that Andrew's claim, like Antonia's, was barred by laches.

**11.** The trial court did not grant summary judgment on any of Andrew's claims on the ground of *res judicata.* The crucial element of *res judicata* is a final judgment on the merits, *e.g.,*

verse that ruling because Antonia raised issues of material fact concerning the applicability of that doctrine which precluded summary judgment.

Counts, I, II, III, VII, VIII, and X of the complaint in the case at bar are nearly identical to corresponding counts of the complaint in the 1963 action in federal court, and count IX is quite similar. The claim in count VI, which is based on the allegation that Paul altered Guy's will, was not presented in that case, but it could have been. It was closely related to the claims Antonia actually raised in that action, and in fact Antonia testified, in a 1963 deposition, about the alleged alteration of the will. Thus all of these counts, including count IX, could be subject to claim preclusion, for the doctrine of *res judicata* bars "relitigation of not only those matters *actually* litigated but also those which *might have been* litigated in the first proceeding." *Goldkind v. Snider Brothers, Inc.*, 467 A.2d 468, 473 n. 10 (D.C.1983) (citations omitted; emphasis in original); *see Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–2428, 69 L.Ed.2d 103 (1981); *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–415, 66 L.Ed.2d 308 (1980).

■ The federal court case was voluntarily dismissed in 1966 with prejudice as to Antonia. She therefore cannot contend, nor does she, that the dismissal was not a final judgment on the merits. *See* 47 AM. JUR.2D *Judgments* § 1096 (1969). She maintains instead that because there are material issues of fact affecting the validity of the dismissal, summary judgment on the ground of *res judicata* should not have been granted in this case. We agree.

Antonia testified that she agreed to drop the 1963 case when Paul went to her home and tearfully promised that he would provide for her needs and those of her son Andrew, pay her legal expenses in connection with the litigation, and transfer Guy's Place to her at some future time. The complaint in the instant case alleged that Paul had no intention of keeping these promises, and that in fact he did not keep them. The complaint further stated that because of these "willful and intentional misrepresentations," on which Antonia allegedly relied, she was fraudulently induced to dismiss her action against Paul. These allegations were sufficient, for two independent reasons, to preclude summary judgment for Paul on the ground of *res judicata.*

■ "Even though a suit is discontinued in accordance with an agreement of settlement, such discontinuance will not bar a subsequent action for the same cause where the defendant does not carry out the agreement and the plaintiff therefore receives no consideration for the discontinuance." 47 AM.JUR.2D *Judgments* § 1096, at 153 (1969) (footnote omitted). Consequently, if Paul's alleged promises were not fulfilled, there was a failure of consideration, and the dismissal in the 1963 case cannot have *res judicata* effect. In addition, a prior judgment operates as *res judicata* only in the absence of fraud or collusion. *See Riehle v. Margolies*, 279 U.S. 218, 225, 49 S.Ct. 310, 313, 73 L.Ed. 669 (1929); *Christopher v. Sisk*, 133 Md. 48, 51, 104 A. 355, 356 (1918); 46 AM.JUR.2D *Judgments* § 473 (1969). Therefore, if Antonia can prove *either* that Paul made promises which he did not keep, and that she agreed to the dismissal because of those promises, *or* that he fraudulently misrepresented his intentions to induce her to dismiss the case, then the earlier dismissal will not bar the present action. Since the facts concerning the promises and the circumstances under which they were allegedly made are in dis-

*Cromwell v. County of Sac,* 94 U.S. (4 Otto) 351, 352–353, 24 L.Ed. 195 (1877); *Cavell v. 2300 Restaurant, Inc.*, 134 A.2d 583, 585 (D.C.Mun. App.1957), and it is beyond dispute that a dismissal without prejudice does not determine the merits. *E.g., Payne v. Panama Canal Co.,* 607 F.2d 155, 158 (5th Cir.1979); *Fannie v. Chamberlain Mfg. Corp.,* 445 F.Supp. 65, 74 (W.D.Pa. 1977); *Brunswick Corp. v. Chrysler Corp.,* 287

F.Supp. 776, 777–778 (E.D.Wis.1968); *see Public Service Commission v. Brashear Freight Lines, Inc.,* 312 U.S. 621, 626–627, 61 S.Ct. 784, 787–788, 85 L.Ed. 1083 (1941). Therefore, since both the 1963 action in federal court and the 1972 suit in Maryland were dismissed without prejudice as to Andrew, neither dismissal could have raised a *res judicata* bar to Andrew's claims.

pute (Paul has denied making them at all), summary judgment cannot be granted on Antonia's claims on the ground of *res judicata.*[12]

## IV

■ Appellants assert that the release they signed in 1973 does not bar their claims and that the trial court erred in concluding that it did. The release provided that "in ... consideration for the distribution and the close out of the entire assets of the ... Testamentary Trust," Antonia and Andrew released and discharged Paul "from any and all actions and causes of action, claims and demands whatsoever" with respect to the administration of the trust. The trial court held that the release barred Antonia's claims in counts III, VII, and X which arose after the dismissal of her previous action in 1966, all of Antonia's claims in counts II, IV, V, and VI, and Andrew's claims in counts II, III, IV, V, VII, and X. We hold that summary judgment on the basis of the release should not have been granted because there are material issues of fact concerning the validity of the release.

■ A person who signs a contract after having had an opportunity to read and understand it is bound by its provisions. *Paterson v. Reeves,* 113 U.S. App. D.C. 74, 304 F.2d 950 (1962). Since a release is a contract, *Bolling Federal Credit Union v. Cumis Insurance Society,* 475 A.2d 382, 385 (D.C.1984), it is ordinarily binding on the parties if they had an opportunity to read it before signing it, even if they did not in fact read it. *Paterson v.*

*Reeves, supra.* Although Andrew asserted that he did not read the document and was unaware that it was in fact a release, the record shows plainly that he did have an opportunity to read it. Consequently, he should be bound by it unless it is invalid for some other reason. Antonia too should be bound by the release even though it is not clear that she had the ability to read a document written in English. Her lengthy depositions establish that she is an intelligent, rational adult, so that, at the very least, she could have understood the release if someone had read it to her. Thus she cannot avoid the release on the ground that she did not know what was in it unless she can prove that Paul (or someone acting on his behalf) misrepresented its contents to her and that her "failure ... to become informed as to the exact nature of the release before [she] signed it [was] not attributable to [her] negligence." *Household Finance Co. v. Shamley,* 140 A.2d 183, 184 (D.C.Mun.App.1958). In these circumstances, failure to have someone read it to her would almost certainly be negligent. *See Paterson v. Reeves, supra.*

On the other hand, a release, "like any other contract, may be avoided if induced by fraud or misrepresentations." *Page v. Baldon,* 437 S.W.2d 625, 629 (Tex.Civ.App. 1969) (citations omitted). Appellants' principal contention regarding the release is that it was procured by fraudulent concealment and misrepresentation on the part of Paul. According to appellants, Paul misrepresented that the $64,000 which he gave them[13] constituted the entire corpus of the trust, when in fact it was much larger, to induce them to sign the release.[14] If they

12. We affirm the dismissal of Andrew's claim in count I, based on Paul's alleged failure to advise Antonia of her right to renounce the will and claim her statutory share of Guy's estate, on the ground that the right to renounce the will was personal to Antonia. Andrew had no personal stake in the outcome of this particular dispute, and thus he lacked standing to litigate it. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472–473, 102 S.Ct. 752, 758–759, 70 L.Ed.2d 700 (1982); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

13. Although the release stated that Antonia waived "any and all rights to the corpus of the

Trust," she testified that she received approximately half of the $64,000.

14. The release itself states that Paul "has been under no legal obligation to disburse the corpus of this Trust and has undertaken to do so in further consideration of the execution and delivery of this release." Elsewhere the release recites that it is being agreed to "in ... consideration of the distribution and close out of the entire assets of the Guy P. Interdonato Testamentary Trust...." These statements, read together, can only mean that Paul was purporting to disburse the entire corpus, not just part of it, in return for the release of all claims by both Andrew and Antonia.

can prove that, then the release will not bar their claims in this case. *Household Finance Co. v. Shamley, supra,* 140 A.2d at 184; *accord, e.g., LeClair v. Wells,* 395 A.2d 452, 453 (Me.1978) ("A release will ... be set aside if shown to be the product of fraud, misrepresentation, or overreaching" (citation omitted)); *Page v. Baldon, supra,* 437 S.W.2d at 629.[15]

■ The release may be invalid as to Andrew for two additional, interrelated reasons. A release is not valid if it is procured by duress, *see Bolling Federal Credit Union, supra,* 475 A.2d at 386, and "[i]t is legal duress for a trustee to refuse to turn over property to his beneficiary rightfully entitled thereto, except upon condition of signing a release." *Ingram v. Lewis,* 37 F.2d 259, 263 (10th Cir.1930); *cf. Lonergan v. Buford,* 148 U.S. 581, 590, 13 S.Ct. 684, 687, 37 L.Ed. 569 (1893). Andrew testified that his accountant, Thomas Murphy, told him that Paul would not surrender Andrew's half of the trust corpus, to which Andrew had become entitled on his twenty-first birthday, unless he "drop[ped] everything." If Andrew can prove that Paul refused to turn over to him the money to which he was already entitled under his father's will unless he executed a release, then the release is invalid on the ground of duress. Andrew's testimony on this point raises a material issue of fact and precludes summary judgment.

■ Furthermore, a release, like any other contract, must be supported by sufficient consideration, and the consideration is not sufficient unless the releasor receives something of value to which he or she had no previous right. *Roberts v.*

*Browning,* 610 F.2d 528, 535 (8th Cir.1979). At the time the release was signed, Paul was already under an obligation to turn over one-half of the trust corpus to Andrew because Andrew had reached the age of twenty-one on June 21, 1973. Paul's payment to Andrew of what purported to be one-half of the corpus in October 1973 therefore cannot be regarded as consideration for the release.[16] His assertion that he relinquished his rights as a contingent beneficiary to Andrew's share of the trust corpus when he turned the money over to Andrew and Antonia is entirely without substance because ownership of that money had already vested in Andrew on his twenty-first birthday, thereby extinguishing Paul's contingent inheritance.[17] Furthermore, Paul had no right to future legal fees for handling the estate, so that forbearance cannot constitute consideration. The only other consideration recited in the release was the payment of ten dollars to Andrew and Antonia, and in the circumstances of this case the sufficiency of such a paltry sum as consideration is open to serious question. *See Williams v. Walker-Thomas Furniture Co.,* 121 U.S.App.D.C. 315, 350 F.2d 445 (1965) (an unconscionable contract is not enforceable, and fraud can be presumed from contract terms that are grossly unfair). Thus there are material issues of fact regarding the sufficiency of the consideration, if any, underlying the release with respect to Andrew.

■ For all of these reasons we hold that summary judgment should not have been granted to appellee on the ground that appellants' claims were barred by the release.[18]

---

15. The question of whether appellants were negligent in not determining the exact nature and amount of the corpus of the trust before signing the release may also be a material issue of fact. *See Household Finance Co. v. Shamley, supra,* 140 A.2d at 184.

16. Antonia testified that she received at least half of the $64,000 payment, which means that Andrew could not have received more than the one-half share to which he was already entitled.

17. Under the will, Paul would have inherited Andrew's half of the trust corpus only if Andrew

had died without a surviving spouse or children before his twenty-first birthday.

18. We reject Andrew's contention that the release is invalid as to him because of Murphy's and Paul's undue influence. In *Riggs v. Gillespie,* 241 F. 311 (4th Cir.1917), the only case he cites for this proposition, the nephew was very young and inexperienced, had a trusting relationship with his uncle, and had no opportunity to get counsel. The situation in the present case is very different. Andrew owned a business at the time of the release; he had recently brought suit against his uncle in Maryland; and he not

## V

The trial court ruled that Antonia's claims in counts III, VII, and X which arose after the dismissal of her suit in the United States District Court in 1966, all of her claims in counts IV, V, and VI, and all of Andrew's claims in counts II, III, IV, V, VII, and X were barred by the statute of limitations. We hold that the statute of limitations bars the claims of both appellants in counts IV and V concerning two of Paul's alleged promises—but not the third. We further hold that summary judgment should not have been granted on the remainder of Antonia's claims (with the exception of those in count VI),[19] or on any of Andrew's claims, because there are material issues of fact concerning the applicability of the statute of limitations.

### A. *Counts II, III, VII, and X*

■ The statute of limitations begins to run when the facts which form the basis of the claim are discovered, or reasonably should be discovered in the exercise of due diligence. *King v. Kitchen Magic, Inc.*, 391 A.2d 1184, 1186 (D.C.1978); *Fontana v. Aetna Casualty & Surety Co.*, 124 U.S. App. D.C. 168, 169, 363 F.2d 297, 298 (1966); *see Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). In the District of Columbia, however, "[a] defendant is estopped from asserting the statute of limitations as a bar to plaintiff's action if he has done anything that would tend to lull the plaintiff into inaction and thereby permit the statutory limitation to run against him." *Property 10–F, Inc. v. Pack & Process, Inc.*, 265 A.2d 290, 291 (D.C.1970) (footnote omitted); *accord, Dominique v. Ralph D. Kaiser Co.*, 479 A.2d 319, 323 & n. 6 (D.C.1984) (citing cases). The effect of such an estoppel is not necessarily to toll the running of the statute. "If ample time to file suit within the statutory period exists after the circumstances inducing delay have ceased, there is no estoppel against pleading the bar of the statute." *Property 10–F, Inc. v. Pack & Process, Inc., supra*, 265 A.2d at 291; *see Howard University v. Cassell*, 75 U.S. App. D.C. 75, 81, 126 F.2d 6, 12 (1941), *cert. denied*, 316 U.S. 675, 62 S.Ct. 1046, 86 L.Ed. 1749 (1942).

■ To decide whether the statute of limitations bars any of the claims in counts II, III, VII, and X, "we need look no further than the maxim that no man may take advantage of his own wrong." *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232, 79 S.Ct. 760, 761–762, 3 L.Ed.2d 770 (1959). This principle may be "employed to bar inequitable reliance on statutes of limitations." *Id.* at 233, 79 S.Ct. at 762 (footnote omitted). Appellants have alleged that they were "lull[ed] ... into inaction"[20] when Paul made promises to Antonia in 1966 to induce her to drop her suit in federal court, and that they did not discover Paul's intention not to keep his promises until 1981. Paul, on the other hand, has denied that any such promises were made. If appellants' allegations are true, then Paul would be estopped from relying on the statute of limitations as to these four counts. *Property 10–F, supra.* If they are not true, or if appellants failed to bring suit within a reasonable time after the circumstances inducing their forbearance ceased, then the statute of limitations may well bar these claims. *See Brown v. Lamb*, 134 U.S. App. D.C. 314, 414 F.2d 1210 (1969), *cert. denied*, 397 U.S. 907, 90 S.Ct. 904, 25 L.Ed.2d 88 (1970). Thus there are two material issues of fact affecting the applicability of the statute of limitations: whether Paul actually made the promises in 1966, and whether appellants, in reliance upon these promises, were lulled for fifteen years into not bringing suit against Paul for fraud and breach of his fiduciary duty. The presence of these issues in the case precludes the granting of

only had an opportunity to get counsel, but in fact he had counsel (whom he later discharged). On this record, the claim of undue influence is without foundation.

**19.** Because we conclude in part VI, *infra*, that Antonia's claim in count VI is barred by laches, we need not consider whether it is also barred by the statute of limitations.

**20.** *Property 10–F, Inc. v. Pack & Process, Inc., supra*, 265 A.2d at 291.

summary judgment based on the statute of limitations.[21]

### B. *Counts IV and V*

The complaint stated in counts IV and V that Paul failed to keep three promises which he made to Antonia in 1966 to induce her to drop her suit in federal court. The first alleged promise was that Paul would provide for Andrew "throughout his life, whatever his needs may be," and the second was that Paul would reimburse Antonia "for any and all legal expenses, costs and attorney's fees arising out of the dismissal" of the suit. The trial court ruled that both appellants' claims based on the first promise were barred by the statute of limitations. As to the second promise, the court made the same ruling on Antonia's claim, and held that Andrew had no cause of action because the promise was personal to Antonia. The third alleged promise was that upon his death Paul would convey Guy's Place to Andrew (presumably by will) "without further consideration." The trial court ruled that Antonia's claim based on this promise [22] was barred by the statute of limitations and that Andrew's claim must fail because in fact no such promise was made. We hold that the statute of limitations barred any claim by either appellant based on the first two promises.[23] With respect to the third promise, however, we hold that summary judgment was erroneously granted because there are material issues of fact as to both the applicability of the statute of limitations and the exact terms of the promise. We also hold that the statute of limitations cannot bar appellants' claim that a constructive trust should be imposed on Guy's Place because a con-structive trust is an equitable remedy, and therefore not subject to the statute.

The claims based on Paul's alleged promises (count IV) all sound in contract and thus are subject to a three-year statute of limitations. D.C. Code § 12–301 (7) (1981). As to the fraud claim (count V), the action must be brought within three years from the time the fraud was discovered or reasonably should have been discovered. D.C. Code § 12–301 (8) (1981); *see King v. Kitchen Magic, Inc., supra,* 391 A.2d at 1186.

Assuming that Antonia gave Paul a reasonable time to pay her legal fees, we conclude that as to her the statute of limitations began to run no later than a year or two after the dismissal of the suit in 1966. As to Andrew, even if he had a claim based on Paul's promise to pay Antonia's legal expenses (see note 23, *supra*), the statute began to run on his eighteenth birthday, which was in June 1970. *See* D.C. Code § 12–302(a)(1) (1981). Since more than three years have passed since either of those dates, we hold that any claims for damages resulting from Paul's failure to pay Antonia's legal expenses in 1966, as he allegedly promised, are barred by the statute of limitations.

With respect to Paul's alleged promise to provide for Andrew "throughout his life," we conclude that appellants were on notice that Paul was not going to keep this promise no later than 1973, when Andrew inquired about obtaining some money from the trust fund to pay off a bank loan and was told that Paul would not give him anything unless he dismissed his pending suit in Maryland. Since the com-

---

**21.** With regard to Andrew's claims against Paul for his actions as trustee (counts III, VII, and X), there are also issues as to (1) whether Andrew knew the 1972 suit in Maryland was filed, and, if he did know, (2) whether he agreed to dismiss it in 1973 (when he signed the release) because Paul lulled him into inaction by giving him and his mother less than the full corpus of the trust, while representing that it was the full amount.

**22.** Antonia testified that Paul told her that Guy's Place "is going to be yours," but the complaint alleged only that he had promised to convey

Guy's Place to Andrew, not to Antonia. The court ruled that "[a]ny claim on Antonia's behalf for such property predicated upon Paul's alleged promise that 'the place is going to be yours'" must fail on several grounds, one of which was the statute of limitations.

**23.** We therefore do not decide whether Andrew had a cause of action based on Paul's promise to pay Antonia's legal expenses. We also express no opinion on the applicability of the statute of frauds or laches to the claims that Paul breached his promise to provide for Andrew.

plaint in this case was not filed until 1982, nine years later, we affirm the trial court's ruling that appellants' claims for damages based on this promise—assuming *arguendo* that it was made—were barred by the statute of limitations.

■■■ Summary judgment should not have been granted, however, on the claims predicated on the third alleged promise, which was that Paul would convey Guy's Place to Andrew upon his death. In the first place, the statute was inapplicable to the claim that a constructive trust should be imposed on Guy's Place because an action to create a constructive trust is equitable in nature. *See Holmberg v. Armbrecht, supra,* 327 U.S. at 396, 66 S.Ct. at 584; *Naselli v. Millholland,* 88 U.S. App. D.C. 237, 240, 188 F.2d 1005, 1008 (1951); *Blankenship v. Boyle,* 329 F.Supp. 1089, 1112 (D.D.C.1971). With regard to Antonia's claim for damages based on the third promise, there is a material issue of fact as to when appellants found out that Paul was not going to convey Guy's Place to Andrew (or Antonia). Andrew asserts that he, and thus his mother, did not learn of Paul's intention not to fulfill his promise until 1981, little more than a year before this action was filed. Whether this assertion is true, whether appellants should have discovered Paul's intention earlier through the exercise of due diligence, and whether Paul even made such a promise in the first place are unresolved factual issues precluding summary judgment against Antonia on this claim.

Finally, as to Andrew's claim based on the third promise, the court concluded that Paul had never promised that he would convey the property to Andrew. In so ruling, the court relied on Antonia's testimony that she remembered no promises concerning Guy's Place other than Paul's statement that "the place is going to be yours," *i.e.,* Antonia's. Unfortunately, the court overlooked Andrew's testimony that Paul had promised to leave the property to both Andrew and Antonia. Because of this critical factual dispute concerning the exact wording of the alleged promise, summary judgment should not have been granted.

## VI

The trial court ruled that Antonia's claims in counts III, VII, and X which arose after the dismissal of her federal court case in 1966, all of her claims in counts IV, V, and VI, and all of Andrew's claims in counts II, III, VII, and X were barred by laches. We hold that laches bars only the claims in count VI based on the allegation that Paul altered Guy's will before it was admitted to probate.[24]

■■■ A successful defense of laches has two elements: an unreasonable and unexplained delay by one party, and prejudice to the other party resulting from the delay. *Schmittinger v. Schmittinger,* 404 A.2d 967, 970 (D.C.1979); *American University Park Citizens Ass'n v. Burka,* 400 A.2d 737, 740 (D.C.1979); *Amidon v. Amidon,* 280 A.2d 82, 84 (D.C.1971) (citing cases). The party asserting the defense has the burden of establishing both elements. *American University Park Citizens Ass'n, supra,* 400 A.2d at 740. When actual fraud is involved, as alleged in this case, "relief will be barred only where the delay has worked to the disadvantage of the defendant." *King v. Kitchen Magic, Inc., supra,* 391 A.2d at 1187 (citations omitted).

In considering the reasonableness of the delay, "the utmost leniency is manifested by the courts where it appears that the delay is due to the intimate personal relationships existing between the parties and the high degree of confidence reposed by one in another. In such cases, and especially when the family relation exists, the same degree of diligence is seldom required." *Horton v. Horton,* 63 App. D.C. 375, 376, 72 F.2d 831, 832 (1934). In the instant case, this principle is relevant insofar as Antonia did not want to cause fur-

24. The trial court held that laches barred those claims in counts IV and V which were based on Paul's alleged promise to provide for Andrew. Having held in part V, *supra,* that the statute of limitations required dismissal of these claims, we need not decide whether they were barred by laches also.

ther strain between Andrew and his uncle Paul, and insofar as both appellants relied on Paul for business and legal advice in the 1950's and early 1960's, up to the filing of the suit in federal court.

■ With regard to the claims based on Paul's alleged promise that he would convey Guy's Place to either Antonia or Andrew (counts IV and V), there is, as we have already said, a material issue of fact concerning whether such a promise was ever made. If it was made, there is a further issue as to whether appellants unreasonably delayed in bringing an action to compel Paul to transfer ownership of that property. With regard to both appellants' claims that Paul breached his duties as trustee (counts III, VII, and X) [25] and Andrew's claims that Paul breached his duties as executor (count II), appellants contend that Paul's misconduct—*i.e.*, making promises which he did not intend to keep—was the cause of their delay in bringing those claims and thus that the delay was explained and excusable. Here again there are factual disputes as to whether those promises were actually made and, if so, whether appellants' reliance on them was reasonable. Thus the first element of the defense of laches was not established as to any of these claims.

Nor, with one exception, was there any showing of prejudice as the case law requires. "Two kinds of prejudice support a laches defense. Plaintiff's delay in filing suit may have resulted in a loss of evidence or witnesses supporting defendant's position, or the defendant may have changed [his] position in a manner that would not have occurred but for plaintiff's delay." *Gull Airborne Instruments, Inc. v. Wein-*

*berger*, 224 U.S. App. D.C. 272, 278, 694 F.2d 838, 844 (1982) (citation omitted). The trial court made no findings that Paul had been prejudiced by appellants' delay in bringing suit on any of the claims we have mentioned, and Paul has not identified any prejudice apparent on the face of the record. Thus the second element of the defense of laches was not established either, and summary judgment should not have been granted.

■ The one exception to what we have just said concerns Antonia's claim in count VI, based on the allegation that Paul fraudulently altered Guy's will before it was admitted to probate. We hold that this claim is barred by laches. Paul has shown that he was prejudiced by the delay: the drafter of the will, Mr. Rosenfeld, and at least one of the witnesses to the will are dead. Moreover, Antonia's delay is not excusable. Her own testimony showed that she was aware of the alleged alteration since shortly after Guy's death in 1953, when Paul first told her about it, yet she has sought no remedy for it until now. Since she did not raise it in the 1963 suit in federal court, she cannot assert that the promises Paul allegedly made to induce her to drop that suit were the cause of her delay. Thus the evidence establishes both unreasonable delay and prejudice. Because no proof to the contrary is in the record, we hold that summary judgment was properly granted on this one claim on the ground of laches.[26]

## VII

Count IV of the complaint alleged that Antonia dismissed her 1963 suit against

---

**25.** The trial court's ruling that laches barred Antonia's claims against Paul as trustee (counts III, VII, and X) concerned only those claims that arose after 1966. The court ruled that her pre–1966 claims against Paul as trustee were barred by *res judicata*. See part III, *supra*.

**26.** The trial court dismissed Andrew's claim in count VI, based on Paul's alleged alteration of the will, on the ground that Andrew had no cause of action because the "original" will left everything to Antonia. This ruling was erroneous, but the error was harmless. Count VI requested the court, *inter alia*, to declare Guy

Interdonato to have died without a will, reopen the estate, and order that it be handled as if Guy had died intestate. Under D.C. Code §§ 18–703 and 18–706 (1951), which were in effect on the date of Guy's death, Andrew would be entitled to two-thirds of the estate if his father had died intestate, since Guy left no other children. (Antonia would inherit the other one-third.) Thus Andrew, as a potential heir, had a cause of action under count VI. However, for the reasons applicable to Antonia, we hold that Andrew's claim under count VI was also barred by laches.

appellee "with the understanding, representation and express promise, made by [Paul], in Italian, to [Antonia] that, without further consideration, the real estate known as 527–529 8th Street, S.E., Washington, D.C. [Guy's Place], would be entirely turned over in fee to [Andrew] upon [Paul's] death." The trial court held that this claim was barred by the statute of frauds, D.C. Code § 28–3502 (1981),[27] because the alleged promise was oral and not in writing. Appellants argue that this ruling was erroneous. We agree.

 Courts in this jurisdiction have held that a plaintiff's "change of position induced by the [defendant's] parol promise would estop the latter from setting up the statute of frauds." *Ammerman v. City Stores Co.*, 129 U.S. App. D.C. 325, 328 n. 6, 394 F.2d 950, 953 n. 6 (1968) (citations omitted). Such a change of position would include partial performance of the alleged oral contract. *See Hackney v. Morelite Construction*, 418 A.2d 1062, 1066 (D.C. 1980); *Amberger & Wohlfarth, Inc. v. District of Columbia*, 300 A.2d 460, 463 (D.C. 1973). Appellants have alleged and testified that Antonia agreed to drop the 1963 lawsuit, and in fact did drop it, in return for Paul's promise to transfer ownership of Guy's Place to Antonia or Andrew (or to both Antonia and Andrew). Paul has denied making such a promise. Thus there are two material issues of fact: whether the promise was made at all, and if so, whether Antonia changed her position by

performing her part of the bargain in reliance on Paul's promise.[28] Summary judgment therefore should not have been granted on the ground that this claim in count IV was barred by the statute of frauds.[29]

## VIII

To summarize:

(1) We affirm the trial court's dismissal of Andrew's claim in count I, based on the allegation that Paul failed to advise Antonia of her right to renounce the will and claim her statutory share of Guy's estate as his surviving spouse, on the ground that Andrew lacked standing to assert that claim. See note 12, *supra.*

(2) We affirm the award of summary judgment to Paul on the claims of both appellants in counts IV and V based on two of Paul's three alleged promises—to pay Antonia's legal expenses in the 1963 suit and to provide for Andrew throughout his life—on the ground that the statute of limitations barred these claims. See pages 1136–1137, *supra.*

(3) We affirm the trial court's ruling that Antonia's claims in count VI, based on the allegation that Paul altered Guy's will, were barred by laches. We also hold that Andrew's claims in count VI, based on the same allegation, are barred by laches. See page 1138 and note 26, *supra.*

---

**27.** D.C. Code § 28–3502 (1981) provides:

An action may not be brought to charge an executor or administrator upon a special promise to answer damages out of his own estate, or to charge the defendant upon a special promise to answer for the debt, default, or miscarriage of another person, or to charge a person upon an agreement made upon consideration of marriage, or upon a contract or sale of real estate, of any interest in or concerning it, or upon an agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing, which need not state the consideration and signed by the party to be charged therewith or a person authorized by him.

**28.** Since Antonia had filed suit not only on her own behalf but also in a representative capacity

as next friend of Andrew, who was then only ten years old, her dismissal of the suit in reliance on Paul's promise would constitute part performance by Andrew as well as Antonia.

**29.** In *Tauber v. Jacobson*, 293 A.2d 861 (D.C. 1972), this court stated "that the refusal to carry out an oral agreement requiring performance for more than one year does not prevent the application of the statute of frauds, notwithstanding the hardship incurred by the claimant relying upon it." *Id.* at 866 (citation omitted). *Tauber* is inapplicable to the case at bar. In this case appellants allege that they did not merely suffer hardship because of their reliance on the agreement, but that they actually performed their part of the bargain. If they can prove these allegations, the statute of frauds will not apply.

(4) We reverse the remainder of the trial court's order granting summary judgment to Paul, and remand the case for further proceedings consistent with this opinion.[30]

*Affirmed in part, reversed and remanded in part.*

---

30. The trial court ruled that any claims in count IX on behalf of Andrew for an undivided interest in the property at 428 Eighth Street, S.E., based on Antonia's failure to renounce the will, must be dismissed because the right to renounce was personal to Antonia. We vacate this portion of the trial court's order because Andrew did not make any claims with respect to 428 Eighth Street.