819 A.2d 968 (2003)
In re ESTATE OF Daniel B. DELANEY.
Edna J. Valentine, Appellant,
v.
Lawrence M. Elliott, Appellee.
Edna J. Valentine, Appellant,
v.
Lawrence M. Elliott, Appellee.
Lawrence M. Elliott and R. Eliot Rosen, Appellants,
v.
Christopher G. Hoge, Appellee.
Christopher G. Hoge, Appellant,
v.
Edna J. Valentine, Appellee.
Lawrence M. Elliott, Appellant,
v.
Christopher G. Hoge, Appellee.
Nos. 97-PR-1217, 98-PR-934, 98-PR-1104, 98-PR-1771, 99-PR-531, 99-PR-1392, 99-PR-1619, 00-PR-71, 00-PR-768, 00-PR-808, 00-PR-873, 00-PR-904, 00-PR-905, 01-PR-1469.
District of Columbia Court of Appeals.
Argued November 18, 2002.
Decided March 27, 2003.
*976 Walter T. Charlton for appellant/appellee Valentine.
Jason P. Green for appellant/appellee Elliott and appellee Rosen.
*977 William J. Bethune for appellant/appellee Hoge.
Before FARRELL and WASHINGTON, Associate Judges, and BELSON, Senior Judge.
BELSON, Senior Judge:
These fourteen consolidated appeals arise out of the probate proceedings for the estate of Daniel B. Delaney (decedent). The central issues to be decided are: (1) whether a challenge to the will and a claim for status as common law wife were properly dismissed as time-barred; (2) whether certain disputed accounts were correctly determined to be part of the estate; (3) whether compensation was properly denied to the original personal representative and reduced for tax counsel to the estate; (4) whether attorneys' fees were properly denied to the estate and the residuary beneficiaries; and (5) whether the original personal representative was properly removed. We affirm all the challenged orders and judgments.
Since these appeals involve a multitude of facts not all of which are pertinent to every appeal, we begin with a brief exposition of the underlying facts. We will provide the salient facts specific to each appeal as we take up the various appeals in turn.
Mr. Delaney died on August 6, 1993, leaving behind a valuable estate; a long-time acquaintance, Edna J. Valentine, who described herself as Delaney's companion, and later in the course of litigation described herself as his common law wife; and several cousins, including Lawrence M. Elliott. Among Mr. Delaney's effects at the time of his death was a sizable account with a Virginia office of Merrill Lynch that appeared to be jointly held with Valentine.
A will, signed by Delaney on July 18, 1993 ("July 18 will") and naming Valentine as sole beneficiary, was filed shortly after Delaney's death with the Register of Wills of the District of Columbia. Elliott, designated by the will to serve as executor, mailed notice of his appointment as personal representative to Valentine on August 25, 1993, and the Register of Wills admitted the July 18 will to probate on September 9, 1993.
In March of 1994, the personal representative discovered a later will, dated July 31, 1993, ("July 31 will"or "after-discovered will") and filed it with the Register of Wills. Valentine was to receive a relatively minor cash bequest under the July 31 will, with the bulk of the estate going to the National Association for the Advancement of Colored People ("NAACP"), the American Heart Association, and two other charities (collectively "residuary beneficiaries").
The July 31 will named Lawrence M. Elliott (original personal representative) as Executor, as had the July 18 will. After filing the July 31 will, Elliott published the requisite notice of after-discovered will and notice of appointment and mailed a copy of the notice (along with a form known as General Information to Heirs and Legatees) to all those named in the July 31 will, including Valentine. At the time, Elliott was unaware of several other relatives of Delaney, and so did not mail the notice or general information forms to them until much later. Valentine received her copy of the notice on March 28, 1994. The July 31 will was admitted to probate by order dated April 4, 1994, which vacated that portion of the earlier order which had admitted the July 18 will to probate. In re Estate of Delaney, ADM 1809-93.
In August of 1997, Valentine learned "quite by accident" that Delaney had living cousins who were potential heirs. On August 13, 1997, Valentine brought this to the attention of the trial court. The trial court then stayed the case to give the newly-discovered *978 relatives an opportunity to object to the wills. Elliott duly notified the cousins and, in September of 1997, the cousins filed a complaint to contest the validity of both wills. Patton v. Elliott, ADM 1809-93, order dated September 3, 1998. After being granted leave to intervene in the cousins' will contest, the NAACP located and deposed two of the witnesses to the July 31 will. Based on their testimony, the NAACP moved for summary judgment on the issue of the validity of the July 31 will. The trial court (Christian, J.) granted the motion in an order entered September 8, 1998, which was not appealed.

SECTION I: APPEAL NO. 97-PR-1217

1. Appeal-Specific Facts and Procedure
Valentine took this appeal from the trial court's order dated June 27, 1997, barring her challenges to the will as time-barred by the probate statute. D.C.Code, Title 20, งง 20-101 through 20-1305 (1980, as amended in 1995, 1996, and 1997). Valentine is the appellant, and Elliott (personal representative at the time of the appeal) is the appellee.
As Valentine later explained in a deposition, when she received her notice of the after-discovered will in March of 1994, she read the will and was immediately suspicious as to its authenticity. She felt this way because she thought Delaney was so ill that he was unable to write on the day the will was purportedly signed, and because she felt that Delaney "would never have said [what was said in the will] about me." Valentine did not act on her suspicions, however, until much later.
In June of 1995, Elliott brought a subsidiary proceeding against Valentine within the probate proceeding to recover the jointly-registered accounts as assets of the estate, claiming that the accounts were not joint accounts but simply convenience accounts.[1]Elliott v. Valentine, ADM 1809-93. On February 1, 1996, almost two years after receiving the notice as to the July 31 will, Valentine filed an answer in Elliott v. Valentine which "assert[ed]," inter alia, that the will was "a forgery and a fraud." This is the only allegation made of fraud and/or forgery in Valentine's answer.
Sometime in late 1996 or early 1997, Valentine hired a handwriting expert to examine Delaney's signatures on both the July 18 will and the July 31 will. The expert told Valentine that both signatures were forged. Valentine then filed, in Elliott v. Valentine, a motion for leave to file amending and dispositive motions, including, inter alia, a motion to vacate probate order based on new evidence of fraud and common law marriage. She filed this motion on March 17, 1997, almost three years after she received the notice of appointment. In this filing, Valentine made extensive claims of forgery regarding the July 31 will. By order dated March 31, 1997, the court rejected Valentine's challenge to the July 31 will as time-barred. In the order, the court noted that in oral argument held on January 23, 1997, in Elliott v. Valentine, as well as in the February 1, 1996, answer Valentine filed in that case, Valentine challenged the July 31 will as a forgery and fraudulent.
Notwithstanding the court's ruling of March 31, 1997, Valentine filed, on April 7, 1997, a complaint in the nature of a caveat attacking the validity of both the July 18 will and the July 31 will on the grounds of fraud and/or forgery. She also realleged that she was decedent's common law wife. By order entered June 27, 1997, the trial court dismissed Valentine's renewed claims of forgery and her claim to be *979 decedent's common law wife as timebarred under D.C.Code ง 20-903(a)(1) (1981).[2] Valentine took appeal No. 97-PR-1217 from this order; Elliott (personal representative at the time of the appeal) is the appellee.

2. Discussion

A. Jurisdiction

Although appeal No. 97-PR-1217 may have been premature when filed,[3] a final judgment was entered in Elliott v. Valentine on October 20, 1999. This had the effect of ripening the instant appeal thereby giving this court jurisdiction to act because the trial court had entered a final judgment on the entire case. Super. Ct. Civ. R. 54; West v. Morris, 711 A.2d 1269, 1271 (D.C.1998); Dyer v. William S. Bergman & Assocs., Inc., 635 A.2d 1285, 1286-87 (D.C.1993); Robinson v. Howard Univ., 455 A.2d 1363, 1366 (D.C.1983).

B. Standard of Review

The trial court's ruling rejecting appellant Valentine's challenge to the will as time-barred constituted an adjudication of that issue. Although her challenge to the July 31 will arose in the context of Elliott v. Valentine, it was properly a part of In re Estate of Delaney because the issue in Elliott v. Valentine concerned the nature of the jointly-registered accounts. The validity of the July 31 will had no bearing on the nature of those accounts. Had Valentine lodged her complaint against the July 31 will within the probate proceeding itself (In re Estate of Delaney), rather than in a subsidiary proceeding, the order denying her caveat to the will would have functioned as a summary judgment that the July 31 will was properly admitted to probate.
We make an independent, de novo review of the record in deciding appeals from summary judgment. See, e.g., In re Burleson, 738 A.2d 1199, 1203-04 (D.C.1999); Knight v. Furlow, 553 A.2d 1232, 1233 (D.C.1989). In so doing, we use the trial court's standard of review for motions for summary judgment. Knight, supra, 553 A.2d at 1233. Summary judgment is appropriate when there is no genuine issue as to a material fact and the movant is entitled to a ruling as a matter of law on the issue in question. Super. *980 Ct. Civ. R. 56(c). The court must view the record in the light most favorable to the party opposing the motion for summary judgment and resolve any doubts as to the existence of a factual dispute in that party's favor. Duggan v. Keto, 554 A.2d 1126, 1131 (D.C.1989). Thus, we review the record de novo, resolving any doubts as to the existence of a factual dispute in favor of appellant Valentine.

C. Appellant Valentine's Challenge to the Validity of the July 31 Will

On appeal, appellant Valentine presents three alternative theories under which her challenge to the July 31 will is not timebarred. First, she suggests that because she is claiming that the will is a fraud, she should be given the benefit of the discovery rule. Alternatively, she suggests that the three-year civil statute of limitations for fraud should be applied rather than the six-month limitation on bringing challenges to a will. As a final option, she proposes that the late notification of after-discovered heirs of Delaney "restarted" the time for appellant Valentine's caveat as of the date of the late notification.

(1) The Discovery Rule

D.C.Code ง 20-305 states "any person may file a verified complaint to contest the validity of a will within 6 months following notice by publication of the appointment. . . of a personal representative." D.C.Code ง 20-305 (emphasis added). Appellant Valentine does not dispute the fact that she received the notice pertaining to the July 31 will in March of 1994. To excuse the length of her delay, she seeks to toll the will contest statute of limitations by invoking the discovery rule. In support of her theory, appellant Valentine cites Johnson v. Martin, 567 A.2d 1299, 1302 (D.C.1989), where we dealt with the discovery rule in the context of a late objection to an accounting in a probate case.
Valentine is correct that we have allowed the use of the discovery rule in the probate context. Within probate cases the discovery rule has been applied with regard to (1) contesting a personal representative's power to pay expenses relating to devised realty from the residuary estate, see id.; (2) claims of fraud and breach of fiduciary duty under a testamentary trust, see Interdonato v. Interdonato, 521 A.2d 1124 (D.C.1987); and (3) a dispute over two paintings claimed to be estate assets, see In re Estate of McCagg, 450 A.2d 414 (D.C.1982). We have not applied the discovery rule to will contests involving claims of fraud. Interdonato, however, appears to leave open the possibility of such a use of the discovery rule.
One of the many claims brought in Interdonato was an allegation that the decedent's will had been altered before it was offered for probateโessentially a challenge to the will on the basis of fraud. We ruled that the claim (which was brought nineteen years after the will had been admitted to probate) was barred by laches, rather than by any time bar within the statute. Interdonato, supra, 521 A.2d at 1138. A laches determination includes an analysis of whether or not the delay was excusable. This examination is quite similar to a discovery rule analysis.
Although the probate codes of many jurisdictions contain tolling exceptions for fraud to extend the time limit on contesting wills, ours does not. Other jurisdictions have dealt with statutes similar to ours in a variety of ways. See Eliot J. Katz, Annotation, Fraud as Extending Statutory Limitations Period for Contesting Will or Its Probate, 48 A.L.R.4th 1094 (1986). Some have hewn strictly to the statutory language and refused to grant late challenges on the grounds of fraud. These courts reasoned that because the right to contest a will existed only by *981 statute, any challenge to a will could be exercised only within the time limits prescribed by the statute. In addition, these courts considered that the best way to carry out the statute's purpose, which was to ensure the prompt and orderly settlement of estates and to avoid confusion and consequences injurious to the rights and titles of interested parties, was to abide strictly by the statutory deadline regardless of the type of fraud alleged. See, e.g., Criscoe v. Derooy, 384 A.2d 627 (Del.Ch. 1978); Robinson v. First State Bank of Monticello, 97 Ill.2d 174, 73 Ill.Dec. 428, 454 N.E.2d 288 (1983); Ruffing v. Glissendorf, 41 Ill.2d 412, 243 N.E.2d 236 (1968); In re Estate of Thompson, 346 N.W.2d 5 (Iowa 1984).
Other courts have allowed application of the discovery rule for claims of fraud under a probate statute that contained no express tolling provision for fraud. Reasoning that time limitations in the will contest statute did not strip the probate court of its authority to review its own orders of probate, and that a will signed with a forged signature or obtained by undue influence works a fraud on the Register of Wills and on the court, these courts have allowed the use of the discovery rule for claims of intrinsic fraud brought after the statutory time limit for contesting a will.[4]See, e.g., Padgett v. Estate of Padgett, 318 So.2d 484 (Fla.App. 1st Dist.1975); Estate of Colucci, 342 Pa.Super. 349, 492 A.2d 1155 (1985).
We find persuasive the reasoning of this last line of cases. The probate of a will that is a product of intrinsic fraud such as forgery practices a fraud on the probate court and on at least some of the parties to the case. Although the District of Columbia has a strong interest in prompt and efficient probate for estates, it has an even stronger interest in ensuring that a will admitted to probate is not the result of fraud. Thus it seems appropriate to allow the use of the discovery rule for belated will contests based on claims of intrinsic fraud.
Although we hold that the discovery rule can be used to bring a late will contest based on a claim of intrinsic fraud, our holding does not help appellant Valentine. Valentine claims to have "discovered the forgery" in "late February 1997" when she received an expert opinion report that the signature on the July 31 will was a forgery. She filed her "Objection in the Form of a Motion Alleging Fraud and Request for an Evidentiary Hearing" less than a month later, on March 7, 1997. Application of our precedents to what transpired in this case demonstrates that Valentine was chargeable with notice of any alleged fraud from before February of 1997.
"When one person defrauds another, there will be a delay between the time the fraud is perpetrated and the time the victim awakens to the fact." Kropinski v. World Plan Executive Council-US, 272 U.S.App. D.C. 17, 19, 853 F.2d 948, 955 (1988). Because of this inherent delay, "a cause of action [for fraud] accrues for purposes of the statute of limitations when the plaintiff has either actual notice of her cause of action or is deemed to be on *982 inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such investigation, if conducted, would have led to actual notice." Diamond v. Davis, 680 A.2d 364, 372 (D.C. 1996). See also Kropinski, supra, 272 U.S.App. D.C. at 19, 853 F.2d at 955 ("[I]n a fraud case, the statute of limitations will not begin running until the date the fraud is discovered, or reasonably should have been."); Mullin v. Washington Free Weekly, Inc., 785 A.2d 296, 299 (D.C.2001) (citing Colbert v. Georgetown Univ., 641 A.2d 469, 472-73 (D.C.1994)) ("the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing"). "The discovery rule does not, however, give the plaintiff carte blanche to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm." Colbert, supra, 641 A.2d at 473. What constitutes acting reasonably under the circumstances to investigate the problem is a "highly factual analysis," Diamond, supra, 680 A.2d at 372, but usually requires that the injured party be ignorant of the fraud through no "fault or want of diligence or care on his part." Id. at 373 (internal citations omitted). Thus, "the focus of the rule is on when [the plaintiff] gained general knowledge [that she had been injured], not on when she learned of the precise legal remedies [for the injury]. East v. Graphic Arts Indus. Joint Pension Trust, 718 A.2d 153, 157 (D.C.1998) (emphasis in original). See also Ray v. Queen, 747 A.2d 1137, 1142 (D.C.2000) (distinguishing between discovery rule and tolling doctrine).
Turning to the timing of relevant events in this case, we see that Valentine received notice of the July 31 will on March 28, 1994. In a deposition, she admitted reading the will and having immediate suspicions as to its authenticity because, she said, Delaney was no longer able to write on the day the will was purportedly signed, and because she felt that Delaney "would never have said [what was said in the will] about me." Valentine's immediate suspicions about the will placed upon her the obligation to move promptly and with reasonable diligence to inquire further into the matter. Instead of making a reasonable, prompt, and diligent inquiry, Valentine did nothing from March 28, 1994, until the end of 1996 or early 1997 when she engaged the services of a handwriting expert. This hardly constitutes reasonable diligence on her part. For our purposes here, we need not determine precisely how soon after March 28, 1994, Valentine, for the purposes of reasonable diligence, should have concluded her inquiry into the circumstances surrounding the execution of Delaney's will of July 31, 1993, for it is clear that a reasonably diligent inquiry could have been completed substantially more than six months before Valentine filed her attack on the will in March of 1997. Under the probate statute, that statutory clock ran out six months after such inquiry could have been concluded. Therefore, even allowing full play for the discovery rule in applying ง 20-305, Valentine's attack on the will in March of 1997 came far too late.

(2) Statute of Limitations for Civil Fraud

As an alternative theory for allowing her to mount a will contest, Valentine argues that the presence of fraud in the making of the will, e.g., securing Delaney's signature on it at a time when he could not write, invokes the probate court's equity jurisdiction and allows it to use the statute of limitations for civil fraud. Under D.C.Code ง 12-301, the time limit for bringing an action for forgery or fraud is three years. D.C.Code ง 12-301(8). *983 Many courts have held that a provision in the general statutes of limitations for fraud does not apply to a will contest when the statute governing wills contains its own limitations provision. This is because a will contest is purely a creature of statute, is not derived from common law causes of action, and therefore should be governed by statutes of limitations provisions in its creating statute rather than those derived from the common law. See, e.g., Riddell v. Edwards, 32 P.3d 4, 8 (Alaska 2001) ("[W]ill contests are unknown to the common law and exist only as permitted by statute." (internal quotations omitted)); Estate of Kitterman v. Pierson, 661 N.E.2d 1255, 1257 (Ind.Ct. App.1996) ("The right to contest a will is statutory."); In re Estate of Thompson, 346 N.W.2d 5, 7 (Iowa 1984) (declining to apply doctrine of fraudulent concealment so as to extend time for challenging wills which have been admitted to probate); Miller v. Munzer, 251 S.W.2d 966 (Mo.Ct. App.1952); In re Peterson, 102 Wash.App. 456, 9 P.3d 845, 850 (2000) ("Will contests are statutory proceedings and courts must be governed by the provisions of the applicable statutes," rather than by the rules of civil procedure (internal quotations and citations omitted)).
Other courts have shown themselves reluctant to apply civil statutes of limitation to probate proceedings because to do so would run directly counter to the state's strong interest in the orderly settlement of estates. See, e.g., Pedersen v. Dempsey, 341 Ill.App. 141, 93 N.E.2d 85, 86 (1950).[5]
On the whole, it seems most reasonable to us to use only the will-contest statute of limitations for probate cases. Since the probate code itself sets forth a period of limitations for contesting a will, there is neither need nor reason to look elsewhere for a different time limitation. Furthermore, if we read the three-year statute of limitations for civil fraud into the probate statute, that three-year period might be further extended by application of the discovery rule. This could unleash grave uncertainty into the world of probate. Under this approach, a plaintiff conceivably could reopen a probate case years after it was closed and after the estate had been distributed. This is directly contrary to the District's strong policy interest in the orderly settlement of estates. We hold that the statute of limitations for fraud embodied in D.C.Code ง 12-301(8) does not apply to will contests under the probate code. Therefore, the six months limitation period of the probate statute applies.

(3) Restarting the Statutory Clock

As a final alternative theory for allowing her challenge to the July 31 will, Valentine proposes that the late notification of after-discovered heirs of Delaney "restarted" the time for the filing of her caveat as of the date of the late notification. However, Valentine cites no support for this proposition, and we are aware of none. The relevant statute clearly states that the interested party has six months from the time of publication of the notice of appointment within which to challenge the will. Valentine refers us to nothing in our cases or the statute that can be read to mean that if the notice is published again for the benefit of other interested parties, the later publication becomes a new publication *984 date for parties who already received notice.

D. Common Law Wife Claim

In addition to challenging the will as the product of fraud, Valentine's motion dated March 17, 1997, also claimed, for the first time, that she was Delaney's common law wife. This claim is not barred under D.C.Code ง 20-305 because it does not contest the validity of the will.[6] Presumably, Valentine asserted that she was decedent's common law wife so that she could claim a spouse's statutory share of the estate, a claim she could make regardless of the validity of the will.
D.C.Code ง 19-113(a) provides a six-month period from the time the will is admitted to probate for a surviving spouse to renounce "any devise or bequest made... by the last will of my husband" and to "elect to take in lieu thereof my legal share of the real and personal estate of my deceased spouse." This period does not begin to run until the end of any action to construe the will of the decedent (D.C.Code ง 19-113(c) (2001)), but that is the only tolling provision provided in the statute. In other words, the statute is not tolled for an individual who suddenly "discovers" that she was the decedent's common law wife three years after a will is admitted to probate.[7] Since appellant Valentine could be attempting to claim common law wife status only for the purpose of electing a statutory share of the estate, and since any election of the statutory share is clearly time-barred, appellant Valentine's assertion of common law wife status is time-barred as well.
In light of the foregoing, we affirm the trial court's order dated June 27, 1997, dismissing both the challenge to the will and the common law wife claim as time-barred.

SECTION II: APPEAL NOS. 98-PR-934; 98-PR-1104; 98-PR-1771; 99-PR-531; 99-PR-1392 & 99-PR-1619

1. Appeal-Specific Facts and Procedure
This set of six appeals stems from various aspects of the trial court's decisions as to the disputed Virginia accounts. As noted above, Elliott filed a subsidiary proceeding within the probate proceeding against Valentine in June of 1995 (Elliott v. Valentine) to recover funds in two accounts on behalf of the estate. The accounts in question were a credit union account and a Merrill Lynch cash management account. Both accounts were maintained in Virginia and established with funds contributed entirely by decedent Delaney.
The credit union account was opened in 1986. Although the names of both Delaney and Valentine appear on the account card filled out by Valentine, Delaney's social security number was the only personal identification number to appear on the account. Delaney, the sole depositor, never signed the card entitled "joint account" and never made a joint account election. Quarterly statements were sent only to Delaney, who was the sole taxpayer on the income from the account.
Delaney had opened the Merrill Lynch account in 1962, and it contained the bulk of his liquid assets. This account was *985 registered solely in Delaney's name until four days before his death on August 6, 1993. On July 19, 1993, the day Delaney was transferred to a different hospital to undergo a new round of treatment, he executed a power of attorney appointing Valentine as his attorney in fact for convenience in maintaining his property and to use his property for his care, support and maintenance. Merrill Lynch did not honor this power of attorney, and Valentine could not use it to write checks on that account to pay Delaney's bills. With her assistance, on July 28, 1993, Delaney completed the paperwork to change the Merrill Lynch account to a joint account, by establishing a new, joint account, in his name and hers so that she could pay his bills. Three days later, on July 31, 1993, decedent signed the will that was eventually admitted to probate, which stated "all I own in any form is my property, with no pre-death gift intended." Valentine transferred the funds from Delaney's original Merrill Lynch account to the new joint account on August 2, 1993, three days before his death.
Immediately after Delaney's death, Valentine transferred the funds again, this time to a new joint account in the names of Valentine and her daughter. Valentine then began spending the funds and transferring funds to her children.
As personal representative, Elliott sued Valentine on behalf of Delaney's estate, contending that the Virginia accounts were not joint accounts but simply convenience accounts and therefore part of the estate. After Valentine answered Elliott's complaint, Elliott filed a motion seeking a summary judgment that the estate was entitled to the return of the proceeds of the Merrill Lynch and credit union accounts, ordering an accounting, directing Valentine to divest herself of all funds and other assets that had been Delaney's or were acquired with his funds, and for other relief. Elliott filed this motion one day after the deadline for such filings, and the court rejected it. Elliott then filed a motion for consideration of his motion for summary judgment which was, in effect, a motion to permit the filing of the motion after the deadline. When the parties appeared before the court for a hearing on January 23, 1997, and the court undertook to hear argument on Elliott's motion for summary judgment, Valentine's counsel indicated that he had understood that the hearing was not on the motion for summary judgment, to which he had not filed an opposition, but merely on Elliott's motion to permit the late filing of the motion for summary judgment.[8] While counsel's reading of the court's order scheduling the hearing was plausible, the court intended its order to schedule a hearing on the motion for summary judgment itself. Without seeking a continuance or leave to file a written opposition, Valentine's counsel argued against granting the motion for summary judgment. Valentine prevailed in her opposition to summary judgment on the merits of the issue of the estate's entitlement to a return of the proceeds of the two Virginia accounts. The court, however, granted the estate's motion with respect to an accounting and the creation of an escrow account.[9]
*986 Following the hearing, on January 24, 1997, the trial court issued an order requiring Valentine to place the disputed funds in the court registry. On January 27, 1997, the court issued an order in Elliott v. Valentine appointing an auditor and requiring an accounting of the disputed funds.
On August 13, 1997, Valentine brought Delaney's newly-discovered relatives to the attention of the trial court. Once the court learned of Delaney's additional relatives, it stayed Elliott v. Valentine (the action instituted by Elliott to procure the Virginia accounts) to give the newly-discovered relatives an opportunity to object to the wills. The cousins were duly notified by Elliott and, in September of 1997, the cousins filed a complaint to contest the validity of both wills (Patton v. Elliott). Two of the charities that are beneficiaries under the July 31 will sought to intervene in Patton v. Elliott. By orders issued February 4 and February 20, 1998, the trial court allowed the American Cancer Society and the NAACP to intervene in Patton v. Elliott. Sometime after that order was issued, Valentine sought to intervene in Patton v. Elliott, but the court denied her motion to intervene in an order dated May 20, 1998. This order was subsequently appealed (No. 98-PR-1104). On the same day, the trial court ordered Valentine to pay the auditor's fees in Elliott v. Valentine, and Valentine appealed that order as well (No. 98-PR-934).
In the summer of 1998, the NAACP moved for summary judgment in Patton v. Elliott. By order issued September 8, 1998, the trial court granted the NAACP's motion. This order was not appealed. In November, the trial court issued a consent order requiring Valentine to pay the auditor's fees, and Valentine noted yet another appeal (No. 98-PR-1771).
On March 23, 1999, the trial court issued its findings of fact and conclusions of law on the issue of whether or not the accounts were a part of the Delaney estate. Valentine noted an appeal from the trial court's findings of fact and conclusions of law (No. 99-PR-531). (Although it was premature, this appeal has since ripened.) On October 20, 1999, the trial court issued its order of judgment which Valentine appealed (No. 99-PR-1392). Valentine also moved for a stay of enforcement of the judgment pending the results of appeal No. 99-PR-1392, but the trial court denied the stay in an order dated November 1, 1999. Valentine appealed the order denying the stay as well (No. 99-PR-1619).
Valentine has failed to address the issues raised in some of her multitude of appeals in the briefs she submitted, as is required by our rules. D.C.App.Ct. R. 28(a)(5). Not addressed are: the appeal from the order to pay auditor's fees (No. 98-PR-934), the appeal from the denial of Valentine's motion to intervene in Patton v. Elliott (No. 98-PR-1104), the appeal of the consent order requiring payment of auditor's fees (No. 98-PR-1771), and the appeal from the denial of the request for a stay of enforcement (No. 99-PR-1619). We deem these appeals abandoned and dismiss them. D.C.App. R. 14. What remain are Valentine's appeals from the March 23, 1999, findings of fact and conclusions of law (No. 99-PR-531), and the October 20, 1999, judgment and judgment order (No. 99-PR-1392). Christopher Hoge (successor personal representative) is the appellee in those appeals.
Valentine argues that the trial court: (1) lacked jurisdiction to determine whether the accounts were part of the estate; (2) erred in its choice of law determination; (3) erred in determining that the *987 accounts were part of the estate; and (4) violated her Constitutional due process rights and "freedom of contract" rights when it required her to deposit the disputed funds into the court registry.[10]

2. Discussion

A. Standard of Review

This court reviews choice of law questions de novo. Herbert v. District of Columbia, 808 A.2d 776, 779 (D.C.2002); Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d 198, 200 (D.C.1997) (citing Hercules & Co. v. Shama Rest. Corp., 566 A.2d 31, 40 (D.C.1989)); Atkins v. Industrial Telecomms. Ass'n, 660 A.2d 885, 888 (D.C. 1995).

B. Trial Court's Jurisdiction to Determine Whether the Accounts were Part of the Estate

Valentine asserts that the trial court had no jurisdiction to determine whether the accounts maintained in Virginia were part of the estate. We cannot agree. The Probate Division of the Superior Court has subject matter jurisdiction over the estate of any decedent who was domiciled in the District at the time of death. Lipscomb v. Lipscomb, 105 U.S.App. D.C. 240, 265 F.2d 822 (1959) (unless decedent was domiciled in District of Columbia, District courts are without jurisdiction to probate will); In re Estate of Dapolito, 331 A.2d 327 (D.C.1975) (jurisdictional issue related to whether decedent was domiciled in District of Columbia). See also REPORT OF THE COMMITTEE ON THE JUDICIARY RE: DISTRICT OF COLUMBIA PROBATE REFORM ACT OF 1980, p. 11 (explaining that Superior Court "may exercise jurisdiction over the estate of a person domiciled in the District"). Clearly, the trial court had subject matter jurisdiction over the estate.
Since the court had general subject matter jurisdiction over the estate, it also had more specific subject matter jurisdiction over the dispute as to ownership of the funds from the jointly-registered accounts because the dispute was a "claim. . . existing between" the executor and a legatee. D.C.Code ง 11-921(a)(5)(A)(vi). Indeed, Valentine's counsel at the time conceded the court's general subject matter jurisdiction at the January 23, 1997, hearing when he said "I don't think we've ever disagreed with this Court's right to determine ... and jurisdiction to determine who is the owner of those funds."
Valentine also argues on appeal that the court erred in failing to hold an evidentiary hearing on the issue of its jurisdiction over the accounts prior to making any other determinations. Her brief cites five cases in support of this proposition, only two of which have even limited relevance. Both of these cases hold that in probate matters where there is a dispute as to the domicile of the decedent, the court must address the question of subject matter jurisdiction first. See Lipscomb, supra, 105 U.S.App. D.C. at 240, 265 F.2d at 822; Dapolito, supra, 331 A.2d at 327. There was no dispute here as to Delaney's domicile *988 at the time of his death. Furthermore, far from contesting jurisdiction, Valentine conceded it at the January 23, 1997 hearing. The court was not required to hold a hearing on the matter of its jurisdiction over the estate.

C. The Choice of Law Determination

(1) Preliminary Matter

Faced with a conflict of law situation, a court's first step must be to determine which area of law is presented by the underlying issue (torts, property, contracts, etc.). Appellant Valentine has asserted that the conflict of law issue should be resolved as though the dispute over the accounts involved property rights or, alternatively, as though the case were a contract case. This is not, however, a case involving property, nor is it a contract issue. Although the forms relating to the joint accounts constituted a contract between Delaney and Merrill Lynch, we are not being asked to construe or enforce that contract. The issue here is one of probate lawโwhether or not the accounts in question pass within the estate or outside the estate. Thus it is appropriate to begin by considering whether there is a conflict between District of Columbia probate law and Virginia probate law on the manner in which they treat joint accounts.

(2) The District's Choice of Law Principles

In determining which jurisdiction's law will apply to substantive issues, District of Columbia courts use a government interest analysis which requires first a court evaluation of the governmental policies underlying the applicable conflicting laws and then a determination as to which jurisdiction's policy would be most advanced by having its law applied to the facts of the case. See Felch v. Air Florida, Inc., 275 U.S.App. D.C. 403, 866 F.2d 1521, 1523 (1989) (citing Williams v. Williams, 390 A.2d 4, 5-6 (D.C.1978)). See also Stutsman v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc., 546 A.2d 367, 372 (D.C.1988); Rong Yao Zhou v. Jennifer Mall Rest., Inc., 534 A.2d 1268, 1270-71 (D.C.1987); Gaither v. Myers, 131 U.S.App. D.C. 216, 404 F.2d 216, 222-24 (1968). "When the policy of one state would be advanced by application of its law, and that of another state would not be advanced by application of its law, a false conflict appears and the law of the interested state prevails. Where each state would have an interest in the application of its own law to the facts, a true conflict exists and the law of the jurisdiction with the stronger interest will apply." Biscoe v. Arlington County, 238 U.S.App. D.C. 206, 738 F.2d 1352, 1360 (1984) (footnote omitted), cert. denied, 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985). Using this analysis, "this Court applies another state's law when (1) [the other state's] interest in the litigation is substantial, and (2) `application of District of Columbia law would frustrate the clearly articulated public policy of that state."' Herbert, supra, 808 A.2d at 779 (citing Kaiser-Georgetown Cmty. v. Stutsman, 491 A.2d 502, 509 (D.C.1985)).
In an effort to avoid creating a "ready means of producing fraud and injustice," Imirie v. Imirie, 100 U.S.App. D.C. 371, 372, 246 F.2d 652, 653 (1957), the District of Columbia presumes that a joint account opened by an individual for himself and another, where the individual who opened the account provided all the funds therein deposited, was opened for the convenience of the decedent-depositor. Davis v. Altmann, 492 A.2d 884, 885 (D.C.1985). This presumption holds true even where the printed bank cards signed by both parties recite a right of survivorship. Imirie, supra, 100 U.S.App. D.C. at 372, 246 F.2d at 653.
In contrast, Virginia, in a departure from its common law, has created statutory *989 presumptions that (1) sums of money "on deposit at the death of a party to a joint account belong to the surviving party... as against the estate ... unless there is clear and convincing evidence of a different intention at the time the account is created," VA. CODE ANN. ง 6.1-125-5.A (2002), and (2) any joint tenancy of real or personal property functions as a tenancy in common upon the death of one of the tenants. VA. CODE ANN. ง 55-20.[11] This last section does not apply, however, "when it manifestly appears from the tenor of the instrument ... that it was intended the part of the one dying should then belong to the others." VA. CODE. ANN. ง 55-21 (2002). Both ง 55-20 and ง 55-21 have been held to apply to investment accounts.[12]Buck v. Jordan, 256 Va. 535, 508 S.E.2d 880, 883 (1998). Thus, while Virginia starts with a presumption of either joint tenancy with survivorship (for cash in bank accounts) or tenancy in common (for property and brokerage accounts), it is willing to look at the language of the forms creating the account and surrounding circumstances to determine whether the decedent-depositor intended a joint account with right of survivorship. Virginia did this to meet the expectations of parties signing the forms to create a joint account (when those forms include survivorship language),[13] create consistency in its law, and protect its financial institutions.[14]
Since there is a clear conflict between the public policies of the two jurisdictions, and since both jurisdictions have an interest in applying their law to the facts in this case, "a true conflict exists and the law of the jurisdiction with the stronger interest will apply." Biscoe, supra, 238 U.S.App. D.C. at 214, 738 F.2d at 1360 (footnote omitted). The District has a strong interest in preventing "fraud and injustice," Imirie, supra, 100 U.S.App. D.C. at 372, 246 F.2d at 653. Indeed, "the public policy considerations for the presumption of a convenience account are of the highest magnitude." Davis v. Altmann, supra, 492 A.2d at 887. The District also has a strong interest in the orderly completion of probate for the estate of a decedent who is a domiciliary of the District.
Virginia's interest is less pronounced since the expectation interests of the parties and the convenience of estate administration cannot readily be characterized as being of the "highest magnitude." Indeed, the Virginia Code essentially acknowledges that Virginia's interest is weaker, because it releases Virginia's jurisdiction over property such as the two accounts here so *990 long as certain procedures are followed. Under the Virginia Code, the administrator of a nonresident decedent's estate may claim "stocks, bonds, securities, money or tangible personal property located in" Virginia after following notification procedures. VA. CODE ANN. ง 64.1-130 (2002).
On balance, then, the District's interests are substantially stronger, and its law governs. Biscoe, supra, 238 U.S.App. D.C. at 214, 738 F.2d at 1360 (footnote omitted). The trial court was correct in applying District of Columbia law to determine whether or not the accounts were part of the estate.

D. Status of the Accounts Under the Law of the District of Columbia

In the District of Columbia, "[w]here a party opens a joint account for himself and another without consideration, the account is presumed opened for the convenience of that party." Davis v. Altmann, supra, 492 A.2d at 885. See also Murray v. Gadsden, 91 U.S.App. D.C. 38, 44, 197 F.2d 194, 200 (1952); Edstrom v. Kuder, 351 A.2d 506, 509 n. 7 (D.C.1976). This convenience account presumption always applies where the funds were deposited by only one of the parties, even where the printed bank card signed by the parties recites a right of survivorship. Imirie, supra, 100 U.S.App. D.C. at 372, 246 F.2d at 653. The presumption puts the person who is claiming that the account carried a right of survivorship in the position of claiming that the account funds were an inter vivos gift, and shifts the burden of proof to that person. Harrington v. Emmerman, 88 U.S.App. D.C. 23, 27, 186 F.2d 757, 761 (1950); Duggan, supra, 554 A.2d at 1134; Davis v. Altmann, supra, 492 A.2d at 885. When the claim of an inter vivos gift comes after the alleged donor had died, the gift must be proven by clear and convincing evidence. Uckele v. Jewett, 642 A.2d 119, 123 (D.C. 1994); Duggan, supra, 554 A.2d at 1134; Estate of Presgrave v. Stephens, 529 A.2d 274, 280 (D.C.1987).
Both the credit union and the Merrill Lynch accounts were presumptively convenience accounts since all the funds on deposit in both accounts were provided by Delaney. This left appellant Valentine in the position of having to prove, by clear and convincing evidence, that the accounts were intended as inter vivos gifts. The requisites of a valid inter vivos gift are delivery, intention on the part of the donor to make a gift, and absolute disposition of the subject of the gift. Uckele, supra, 642 A.2d at 123; Duggan, supra, 554 A.2d at 1134. Appellant Valentine simply did not have such evidence to present as to either account.
The credit union account agreement lacked signatures for the joint and survivor election, and the July 31 will specifically bequeathed the account to Valentine, a clear indication that Delaney did not think he had given her the account during his lifetime. The Merrill Lynch account funds were never delivered to Valentine, but were simply shifted by ledger entry into the account Valentine had opened with Delaney's power of attorney. There is no evidence that Delaney intended to make a gift of these funds, nor did he have a habit of presenting Valentine with large or expensive gifts while he was alive. The trial court was correct in finding that both accounts were convenience accounts, rather than joint accounts with a right of survivorship, and that no inter vivos gift had been made as to either account.[15]

*991 E. Constitutional Due Process Rights and "Freedom of Contract Rights"

The last of Valentine's many claims in this set of appeals is that the trial court violated her Constitutional due process and "freedom of contract" rights when it required her to deposit the disputed funds into the court registry. With respect to due process, Valentine's claim is that she received inadequate notice of the hearing, and that the hearing itself was also inadequate.

(1) Due Process

The requirement of procedural due process prevents the government from arbitrarily depriving persons of their property. Due process contemplates a fair process or procedure which requires at least an opportunity to present objections to the proposed action to a fair, neutral decision-maker when the government undertakes to deprive an individual of property.
The order to deposit the funds in question into the court registry was issued orally at a hearing held January 23, 1997, and in written form on January 27, 1997. The court had scheduled the hearing to consider the estate's motion for summary judgment. The trial court recognized that the estate's motion for summary judgment presented several separate but related requests for relief, including a motion for summary judgment on the issue of whether the accounts were part of the estate, a motion for an accounting of the funds, and an embedded motion to bring the funds into the court's "domain" pending resolution of the underlying dispute. This was a reasonable interpretation of the motion and its accompanying proposed order (which required deposit of disputed funds into escrow account).
At the hearing, Valentine's then attorney stated that he was not fully prepared to argue the merits of the motion for summary judgment and had not filed an opposition because he had been awaiting a ruling on his objection to the timeliness of the motion. However, Valentine and her attorney had clearly received notice that the court planned to hold a hearing that day, and both she and her attorney were present. As we note above, Valentine's attorney's reading of the scheduling order was not implausible. Counsel, however, neither sought a continuance nor asked leave to file an opposition after the hearing. At the hearing, counsel argued on the merits against the granting of summary judgment on the estate's claim that it was entitled to have Valentine return to it the proceeds of Delaney's two Virginia accounts, and prevailed on that point. The court, however, granted the estate's motion as it pertained to an accounting and the placing of the proceeds of the accounts in escrow. Valentine did not seek reconsideration. Under these circumstances, we cannot hold that the results of the hearing were affected by Valentine's claimed lack of notice.
Nor can we agree that Valentine's due process rights were denied her by the nature of the hearing. Under Super. Ct. Civ. R. 12-I(f), the court, within its discretion, may decide whether or not to hold a hearing on a motion. See Headspeth v. Mercedes-Benz Credit Corp., 709 A.2d 717, 721 n. 6 (D.C.1998) (citing Pagan v. Horton, 464 A.2d 146, 148 (D.C.1983)). Although counsel for Valentine stated that he had believed the motion for summary judgment would not be considered until a later date, he did in fact argue the matter, with some success. He did not seek a continuance, leave to file additional materials, or reconsideration. Thus, he did not utilize all the procedures available to him. *992 Considering all that transpired, we are satisfied that Valentine received notice and a hearing sufficient to satisfy Constitutional due process requirements.

(2) Freedom of Contract

Appellant Valentine also claims her Constitutional rights under the "Freedom of Contract Clause" of the Constitution were denied to her by the trial court. Assuming she is referring to the Contract Clause of the Constitution (U.S.CONST. art. I, ง 10, cl.1), Valentine is incorrect in her assertion. The Contract Clause applies not to court decisions, but only to state legislation that retroactively impairs contract rights. Tidal Oil v. Flanagan, 263 U.S. 444, 44 S.Ct. 197, 68 L.Ed. 382 (1924).
The trial court's March 23, 1999 findings of fact and conclusions of law and October 20, 1999 judgment and judgment order are affirmed in all respects.

SECTION III: Appeal Nos. 00-PR-71; 00-PR-768 & 00-PR-808

1. Appeal-Specific Facts and Procedure
This group of three appeals is made up of appeals from two orders. The first order denied compensation sought by Elliott (the original personal representative of the estate). The second order disallowed in part the attorneys' fees sought by R. Eliot Rosen, Esq., tax advisor to the estate. The order as to Elliott was appealed by Elliott (No. 00-PR-71). The order as to Rosen was appealed by Rosen (00-PR-808) and by Valentine (00-PR-768), who asserted that Rosen is entitled to no fees. As to the appeals from both orders, the appellees are the residuary beneficiaries including, inter alia, the NAACP and the American Heart Association.

A. Elliott

The July 31 will contains the following clause:
Item XV: My Executor is entitled to receive compensation for daily expenses from time to time and any unusual costs deemed reasonable by the court. I ask that he serve for no Executor fee from anyone.
On April 26, 1994, Elliott filed a request for compensation as Executor. The court (J. Long) denied this request on two bases on August 16, 1994 (the "1994 order"). First, the court noted that Elliott's request did not comport with Superior Court Probate Rule 124.[16] Second, and more important, the court noted that Elliott was seeking payment for personal time rather than "daily expenses" or "unusual costs," and that under Item XV of the will, Elliott was entitled to none of the customary fees paid for the services of personal representatives. The court then denied Elliott's request and ordered that he not file "any such further petitions." Elliott did not appeal this order. Appellees assert that instead of appealing he received an advance from the $365,000 cash bequest to him set forth in Item V of the will.
Elliott made a second request for compensation on October 12, 1999, to which he filed an addendum on November 14, 1999. In his 1999 request, Elliott acknowledged that the 1994 order controlled, but asserted that the 1999 claim was different because he was seeking reimbursement for litigation expenses as "unusual costs." Specifically, Elliott was seeking expenses for work as a paralegal for the estate's tax attorney, Rosen. After a hearing on December 10, 1999, the trial court (J. Christian) issued an order denying Elliott's second request for compensation (the "1999 *993 order"). In so doing, the court first noted that Elliott had requested compensation for personal expenses, not unusual costs or expenses, and that Elliott could not seek payment for personal expenses under the will. The court then took note of the 1994 order and stated that it found the language of that order "controlling" as to its interpretation of Item XV of the will. The appeal before us now is from the 1999 order.

B. Rosen

During the course of the probate of the July 31 will, Elliott hired Rosen as tax counsel for the estate. On October 7, 1999, as Elliott v. Valentine was coming to a close, Rosen submitted a request for compensation in the amount of $74,125.00. After a hearing on December 10, 1999, the trial court issued an order on May 15, 2000, disallowing some of Rosen's line-item compensation requests and reducing others. The result was an award of $38,815.43, of which $750.00 had already been paid.

2. Discussion

A. Discussion as to Elliott

(1) Standard of Review

The governing statute is D.C.Code ง 20-751 (1981) which was in effect when Delaney died, when the will was admitted to probate and when Judge Long issued her 1994 order.[17] The 1993 version of ง 20-751(a) reads: "Reasonable compensation for work performed by a personal representative . . . with respect to administration of the estate pursuant to this title may be paid upon approval by the Court. . . ." D.C.Code ง 20-751(a) (1981) (emphasis added). Since the probate court had complete discretion as to whether or not to approve requests for compensation payments from personal representatives, we review for abuse of discretion. See generally Johnson v. United States, 398 A.2d 354 (D.C.1979).

(2) Level of Discretion Available to the Trial Court

The law of the case doctrine "bars a trial court from reconsidering the same question of law that was submitted to and adjudicated by another court of coordinate jurisdiction." Weinberg v. Johnson, 518 A.2d 985, 987 (D.C.1986). This doctrine applies if the first ruling is "sufficiently final" and is not "clearly erroneous in light of newly presented facts or a change in substantive law." Williams v. Board of Trustees of Mount Jezreel Baptist Church, 589 A.2d 901, 907 (D.C.) (internal quotations and citation omitted), cert. denied, 502 U.S. 865, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991).

(i) Finality

When the 1994 order was entered, there was no probate rule defining the types of orders that were final and appealable.[18] Instead, finality of orders in probate proceedings was governed by the general principles used in other civil proceedings. *994 Murphy v. McCloud, 650 A.2d 202, 203 (D.C.1994) (citing D.C.Code ง 11-721 (1989)). In Murphy, we held that a probate order would be final if it conclusively disposed of or decided the issue or controversy for which that particular part of the proceeding was brought. This would be so even if the decision did not fully and finally dispose of the entire probate proceeding. "In other words, a probate order is appealable if it finally adjudicates a substantial right; on the other hand, if it merely leads to further hearings on the issue, it is interlocutory." Vineyard v. Irvin, 855 S.W.2d 208, 210 (Tex. App.1993) (cited with approval in Murphy, supra, 650 A.2d at 203). The 1994 order met this standard of finality. The issue of the personal representative's compensation under the will is separate from administration of the estate, and was conclusively disposed of by the 1994 order. Elliott could have appealed, but did not. Thus, we must consider whether Elliott has made the requisite showing of clear error.

(ii) "Clearly Erroneous"

The 1994 order was not clearly erroneous when entered, as it was based on an entirely reasonable interpretation and application of Item XV of Delaney's July 31 will. Appellant Elliott presented no additional facts that might establish that the court's 1994 interpretation of the will was clearly erroneous, nor did he bring to light a change in substantive law that rendered the 1994 order clearly erroneous. Since the 1994 order was sufficiently final and not clearly erroneous, it was binding on the trial court in 1999 under the law of the case doctrine. Therefore, in 1999, the trial court had no discretion to award expenses for personal services to Elliott. The only discretion left to the trial court in this area was in determining whether the additional expenses for which Elliott was requesting compensation were for personal services or for "daily expenses" or "unusual costs," since the latter were allowed under the will's Item XV.

(3) Trial Court's Exercise of Its Limited Discretion

When Elliott filed his second request for compensation, he was seeking an award for the litigation support services he personally performed for the attorneys hired by the estate. Elliott implicitly acknowledged the trial court's limited discretion in his second request by requesting compensation for services which he couched as "unusual costs," rather than as personal services, on the ground that Delaney could not have anticipated that Elliott would find himself embroiled in the extensive litigation of Elliott v. Valentine and Patton v. Elliott. Throughout his request, however, Elliott consistently referred to the paralegal work he did under the direction of the estate attorneys as "services." (Elliott never claimed that his paralegal services constituted "daily expenses," which may be compensated under the will.) Furthermore, there was nothing in the second request or its addendum that clearly delineated what was unusual about the costs Elliott had listed.
We find no abuse of the trial court's limited discretion in its ruling that the costs sought in the second request were for Elliott's "personal services," and that therefore the request was barred under both the July 31 will and the 1994 order. The trial court's order of December 13, 1999, denying appellant Elliott's request for compensation is affirmed.

B. Discussion as to Rosen's Appeal of Compensation Order

(1) Standard of Review

We review the trial court's award of attorneys' fees for abuse of discretion. In re Estate of King, supra, 769 A.2d at 780. The trial court is to consider *995 specific statutory factors in arriving at its decision, but "failure to make appropriate findings of fact is itself an abuse of discretion." Id. at 777.

(2) Court's Denial of Some of the Compensation Requested

Appellant Rosen's compensation request was governed by ง 20-751 of the 1993 version of the D.C.Code. The request was to include documentation which showed: (1) a reasonable relationship between the fees being requested and the nature of the services performed; (2) the reasonableness of the time spent; (3) the number of hours expended; (4) the applicant's usual hourly compensation; and (5) the results actually achieved.[19]
In its May 15, 2000 order, the trial court addressed each of the relevant factors in reaching its decision. It also made findings and explained how it arrived at each of the reductions it ordered. The court went on to state the precise number of hours that should be compensated for various types of work, and the hourly rate at which those hours should be compensated. See Williams v. Ray, 563 A.2d 1077 (D.C. 1989) (reversing trial court for failure to specify number of hours that should be compensated and at what rate). Certain entries were rejected because they were not adequately documented, and the court was careful to explain this as well. Similarly, the court explained the ten percent reduction that it applied to Rosen's gross award.[20] Since the trial judge considered the proper statutory factors; made findings as to those factors, see Lemp v. Keto, 678 A.2d 1010, 1021 (D.C.1996), and clearly articulated what hours should be compensated, why some time charged was disallowed, and the appropriate hourly rate for the time allowed, there was no abuse of discretion.

(3) Due Process

Rosen claims he was denied due process because the judge did not hold an evidentiary hearing on the validity of the line items in his compensation request. As discussed in connection with for appeals 99-PR-531 and 99-PR-1392 above, the requirements of due process are flexible and depend on the private and governmental interests implicated by a particular case. See Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Superior Court Civil Rule 12-I(f), applicable to probate proceedings pursuant to Superior Court Probate Rule 1(f), provides that whether or not to hold an oral hearing on a motion is within the discretion of the assigned judge.
In this case, Rosen was afforded notice and a hearing before the judge ruled on his compensation request. He filed a detailed request for compensation, was represented by counsel at the hearing, and had an opportunity to respond to objections raised by other parties. Rosen never requested a hearing specifically to adduce evidence on each line item listed in his request for compensation and cites no cases in support of his assertion that he was entitled to present evidence.
Rosen has failed to establish that an evidentiary hearing would have added anything to the information available to the *996 trial court when it made its ruling on his compensation request. Presumably, Rosen gave the court all the information he thought would support his position when he filed his initial request, and thus an evidentiary hearing would have added nothing to the data available in a way that would have reduced the risk of an erroneous deprivation. Rosen received all the process due to him.
Since Rosen received due process, and since the trial court did not abuse its discretion in determining Rosen's compensation, the trial court's May 15, 2000 order as to Rosen's compensation is affirmed.

C. Discussion of Valentine's Appeal of the Rosen Compensation Order

The trial court's findings of fact, conclusions of law and order of March 23, 1999, stated that Valentine "has forfeited her bequest under the [July 31] will."[21] The trial court so ordered because appellant Valentine's attempted contest of the July 31 will in Elliott v. Valentine stripped her of her status as legatee by operation of the no-contest clause in the July 31 will.[22] Since she is no longer a legatee, appellant Valentine is no longer an interested person under the probate code,[23] and therefore cannot possibly be aggrieved by any decision of the trial court that does not relate directly to her. Only a party aggrieved by an order or judgment may appeal as of right to this court. D.C.Code ง 11-721(b) (2001). Valentine has no standing to appeal any of the trial court's decisions made after October 20, 1999, which do not concern her directly. Therefore, we need not consider the merits of her appeal from the May 15, 2000, order on the issue of appellant Rosen's compensation.

SECTION IV: APPEAL NOS. 00-PR-873; 00-PR-904 & 00-PR-905
These three appeals are taken from a June 6, 2000, order requiring Valentine to pay attorneys' fees to the Delaney estate and the charitable beneficiaries. The Delaney estate appealed from the order to the extent that it was denied attorneys' fees that it sought (No. 00-PR-873). Christopher Hoge, Esq., successor personal representative, is the appellant on behalf of the estate in Appeal No. 00-PR-873, and Valentine is the appellee. Valentine cross-appealed the June 6, 2000, order to the extent that it required her to pay fees to the estate and the charitable beneficiaries (Nos. 00-PR-904 and 00-PR-905). She abandoned these cross-appeals, and they are hereby dismissed. D.C.App. R. 14. This leaves only the estate's appeal from the June 6, 2000, order denying, in part, its request for attorneys' fees.

1. Appeal-Specific Facts and Procedure
During the course of the Elliott v. Valentine and Patton v. Elliott subsidiary proceedings, Valentine made two attempts to challenge the July 31 will (one of which came after the March 31, 1997, order denying her caveat as time-barred), made an extremely belated attempt to assert common law wife status, attempted to intervene in Patton v. Elliott, and was accused by the personal representative (Elliott) and the residuary beneficiaries of interfering *997 with a trial witness. She also filed multitudes of motions, many of which had scant legal basis, and at least four premature appeals. The facts surrounding the challenges to the July 31 will and the assertion of common law wife status are fully discussed above.
Valentine also was the subject of a contempt hearing because she failed to comply with an order requiring her to pay the fees of the court-appointed auditor. The court held another contempt hearing as to one of the trial witnesses because the witness violated a court order prohibiting her from discussing her trial testimony with anyone other than her legal counsel. The witness and Valentine were friends and lived in the same town. Valentine drove the witness to and from the hearings. During those car trips, the witness discussed her testimony with Valentine in violation of the trial court's admonition to discuss her testimony with no one but her lawyer. The witness also changed her testimony after discussing her previous day's testimony with Valentine while riding with Valentine to and from the court. As a result of these activities, the trial court held a hearing with regard to whether to hold the witness in contempt. In a March 23, 1999, order discharging the show cause order as to this witness, the trial court noted both that the witness was forthright in admitting that she had discussed her testimony with others, and that she might have been manipulated by individuals involved in the litigation.
The estate and the charitable beneficiaries, by separate motions, sought more than $450,000 as their costs in responding to Valentine's method of litigation. In their motion, the estate and charitable beneficiaries asserted that many of Valentine's litigation maneuvers were either unreasonable or were made in bad faith, and that both contempt hearings resulted from Valentine's unreasonable conduct. The trial court responded to this motion with a June 6, 2000, order requiring Valentine to pay a total of $6,138 to the Delaney estate and the charitable beneficiaries for attorneys' fees incurred as a result of the contempt hearing on her failure to pay the auditor. On appeal, the estate and charitable beneficiaries assert that the trial court erred in declining to award attorneys' fees (1) incurred in opposing claims that were foreclosed by court order, (2) incurred in opposing claims that Valentine advanced without a good faith basis in law and in fact, and (3) arising from the interference with a trial witness.

2. Discussion

A. Standard of Review

Where a trial court has refused to impose sanctions, the standard of review is whether the trial court abused its discretion. Kennedy v. District of Columbia, 654 A.2d 847 (D.C.1994). When the party seeking sanctions has alleged bad faith as a basis for seeking those sanctions, "the predicate finding of bad faith vel non is a factual one which we review under the clearly erroneous standard." Schlank v. Williams, 572 A.2d 101, 111 (D.C.1990) (inter alia citing D.C.Code ง 17-305(a) (1989)). See also Synanon Found., Inc. v. Bernstein, 517 A.2d 28, 38 (D.C.1986); and Trilon Plaza Co. v. Allstate Leasing Corp., 399 A.2d 34, 38 (D.C.1979). Therefore, we review the trial court's order of June 6, 2000, under a combination of the abuse of discretion and clearly erroneous standards.

B. Discussion

Under Super. Ct. Civ. R. 11(c), a court may impose sanctions on attorneys responsible for violations of section (b) of the Rule.Super. Ct. Civ. R. 11(b) states, in part, that by presenting a pleading to the court, the presenter is certifying "that to the best of the person's *998 knowledge, information and belief, formed after an inquiry reasonable under the circumstances... the claims, defenses and other legal contentions [in the pleading] are warranted . . ." and that "the allegations and other factual contentions have evidentiary support or ... are likely to have evidentiary support after reasonable opportunity for further investigation or discovery." A trial court also has an inherent sanctioning power that transcends specific statutes or rules and extends to the full range of litigation abuses. Chambers v. NASCO, 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Thus, while a court's rules may reach only specified conduct, the court's inherent power fills the gaps. Id. Just as Rule 11 gives the court discretion in imposing sanctions, Super. Ct. Civ. R. 11(c), courts are to exercise their inherent powers to sanction by awarding attorneys' fees with "restraint and discretion." Roadway Express, Inc. v. Piper, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).
A court may award attorneys' fees against a party who has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" in connection with the litigation. Roadway Express, supra, 447 U.S. at 766, 100 S.Ct. 2455 (internal citation omitted). See also Synanon, supra, 517 A.2d at 28. This "bad faith exception is intended to punish those who have abused the judicial process and to deter those who would do so in the future." Synanon, supra, 517 A.2d at 37. See also Kasachkoff v. Ross H. Finn, Co., 408 A.2d 993 (D.C.1979) (per curiam). Courts also may award attorneys' fees against a party who exhibits a "willful disobedience of a court order." Chambers, supra, 501 U.S. at 45, 111 S.Ct. 2123 (internal quotation and citation omitted). See also Roadway Express, supra, 447 U.S. at 752, 100 S.Ct. 2455; Synanon, supra, 517 A.2d at 36.
In awarding attorneys' fees, however, "a party is not to be penalized for maintaining an aggressive litigation posture, nor are good faith assertions of colorable claims or defenses to be discouraged." Lipsig v. National Student Mktg. Corp., 214 U.S.App. D.C. 1, 4, 663 F.2d 178, 180-181 (1980). "In attempting to deter bad faith litigation through attorney fee awards, the court must scrupulously avoid penalizing a party for a legitimate exercise of the right of access to the courts." Synanon, supra, 517 A.2d at 37. For this reason, "[t]he standards of bad faith are necessarily stringent." Adams v. Carlson, 521 F.2d 168, 170 (7th Cir.1975).[24] Under these stringent standards, the awarding of attorneys' fees for bad faith litigation is proper only under "extraordinary circumstances or when dominating reasons of fairness so demand." Synanon, supra, 517 A.2d at 37 (citing Launay v. Launay, Inc., 497 A.2d 443 (D.C.1985)); Andrews v. District of Columbia, 443 A.2d 566 (D.C. 1982); Kasachkoff, supra, 408 A.2d at 993.

(1) Costs Associated with Appellee Valentine's Attempted Challenges to the Will

The estate asserts that Valentine acted in bad faith by violating two orders barring a will contest. First, the estate maintains that the April 4, 1994, order admitting the July 31 will to probate acted as a bar to Valentine's attempted caveat in March of 1997 because by the time Valentine brought this challenge, the six-month *999 statutory time period for bringing a caveat had expired. Second, the estate points to Valentine's pleading filed in early April 1997, which also challenged the July 31 will, and maintains that this filing was also in bad faith since it had been barred by the trial court's order of March 31, 1997, dismissing Valentine's challenges to the will as time-barred. Finally, the estate asserts that Valentine's attempt to intervene in Patton v. Elliott was a violation of the order admitting the will to probate, and the March 31, 1997 and June 27, 1997 orders dismissing Valentine's various challenges to the will.
Even if Valentine's first challenge to the will could be construed as a violation of the order admitting the will to probate, it is not at all clear that any of Valentine's attempted challenges to the will were "entirely without color and . . . asserted wantonly, for purposes of harassment or delay, or for other improper reasons." Browning Debenture Holders' Comm. v. DASA Corp., 560 F.2d 1078, 1088 (2d Cir.1977). This is because a claim is colorable for purposes of a bad faith analysis when it has "some legal and factual support." Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir.1980) (per curiam) (emphasis added). "The question is whether a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." Id. Sanctions should not be imposed unless it is "patently clear that a claim ha[d] absolutely no chance of success" prior to filing. Schwartz v. Franklin Nat'l Bank, 718 A.2d 553, 555 (D.C.1998) (citation omitted); Green v. Louis Fireison & Assocs., 618 A.2d 185, 188-189 (D.C.1992).
As shaky as they were, none of Valentine's challenges to the will sank to such a level as to compel a finding of bad faith and require a court to either award sanctions or risk abusing its discretion. Valentine's initial pleadings were based on some facts that tended to support her claim of a forged will. Her pleadings after the March 31, 1997, order argued for either application of the discovery rule to probate statutory time limitations or use of the fraud statute of limitations in this probate proceeding. Thus she either had some factual support for her pleadings or was arguing for a modification of existing law. The trial court did not commit error when it did not find bad faith on Valentine's part and did not abuse its discretion in refusing to award attorneys' fees for the various challenges to the will.

(2) Costs Associated with Valentine's Common Law Wife Claim

The estate also claims the court should have awarded sanctions because Valentine did not have a good faith basis in bringing her common law spouse claim. According to the estate, Valentine lacked this basis because she could not establish the facts necessary to prove her claim. The claim was advanced by Valentine's recently retained replacement attorney who did not have a transcript of the much earlier deposition of Valentine in which she gave testimony that undercut her common law spouse claim. Predecessor counsel had not had the deposition transcribed. Replacement counsel relied on information given him by Valentine in constructing the common law spouse claim. It is not sanctionable behavior for an attorney to file a complaint based solely on the oral representation of his client without the benefit of independent corroboration. Gray v. Washington, 612 A.2d 839 (D.C. 1992). We are not persuaded that the trial court committed clear error when it did not find bad faith on Valentine's part and conclude that it did not abuse its discretion by refusing to sanction Valentine for bringing this particular claim.

*1000 (3) Costs Associated with Valentine's Interference with a Witness

Lastly, the estate asserts that Valentine should have been assessed attorneys' fees because her interference with a witness resulted in a contempt hearing against the witness which in turn caused unnecessary delay and expense. While it is true that Valentine may have attempted to interfere with the witness by discussing the witness' testimony with her, it is also true that the trial court's prohibition on such discussions was directed at each individual witness, not at the parties to the proceedings.
The witness in question was the CEO of a small credit union and a responsible adult who was capable of obeying the court's order not to discuss her testimony with anyone. We cannot conclude that it was unreasonable for the trial court to hold this witness fully responsible for the contempt hearing that resulted from her violation of the court's prohibition on discussing her testimony with others. Since the trial court did not act unreasonably in so holding, it did not abuse its discretion by declining to require Valentine to pay attorneys' fees for the witness' contempt hearing.

SECTION V: APPEAL No. 01-PR-1469
The last of the appeals before us was noted from the order removing Elliott as personal representative of the estate. Elliott is the appellant and Christopher Hoge, Esq., successor personal representative, is the appellee on behalf of the estate.

1. Appeal-Specific Facts and Procedure
In July of 1994, Elliott was appointed personal representative of the Delaney estate in accordance with Item XIII of the July 31 will which reads:
I hereby nominate, constitute and appoint Lawrence Elliott as Executor and trustee of my Will and ask that he be allowed to serve with no bond. If Lawrence cannot serve for any reason, I nominate Celestine, his wife, to be Executrix with nominal bond.
While serving as personal representative, Elliott failed to locate all of decedent's relatives and provide them with the required notice of his appointment. He also failed to file the estate's District of Columbia fiduciary tax returns for the years 1993-1997 in a timely manner, as a result of which the estate had to pay penalties and interest charges on amounts owing for each of those tax years.[25] Elliott offered two explanations for the late filing of the 1993 return. First, he stated that he purposely did not file the 1993 return on time because it was anticipated that litigation expenses incurred in subsequent years could be allocated to earlier years thereby lowering or eliminating the amount of tax due for 1993. Then, when that proved to be legally impossible, Elliott maintained that he delayed payment so he could use the 1993 tax payment to reduce the federal fiduciary income tax due in 1999. All of this information came to light in 2000 after Elliott filed an Amended Eighth, Ninth and Tenth Accounts for the estate.
The charitable beneficiaries objected to the Eighth and Ninth accounts on the grounds that the late-filed income tax returns had resulted in avoidable penalty and interest charges to the estate. After Elliott responded to those objections, the trial court issued an order on March 8, 2001, declining to approve the account and noting several concerns with the strategy as to the 1993 taxes. The trial court then ordered Elliott to file detailed documentation addressing the court's concerns.
*1001 By July of 2001, Elliott still had not complied with the trial court's requirement of additional documentation. On July 6, 2001, the Register of Wills sent Elliott notice of a summary hearing, scheduled for August 15, 2001, on the question of Elliott's removal for delinquency. Successive hearing dates of October 3 and October 10, 2001, were thereafter noticed and postponed. On October 10, 2001, over the objection of the charitable beneficiaries, the removal hearing was postponed again and rescheduled for November 14, 2001. Notice for all these hearing dates was provided to Elliott. On November 5, 2001, Elliott finally responded to the trial court's March 8, 2001, order to provide further documentation on the 1993 taxes.
The removal hearing was held on November 14, 2001. Later that same day, the trial court issued an order removing Elliott as the personal representative for the Delaney estate. Elliott noted his appeal on November 27, 2001. Two days later, the charitable beneficiaries moved to amend the order to include an explanation of why the trial court did not appoint Elliott's wife as successor personal representative. The next day, November 30, the court issued its amended order.
In his appeal, Elliott asserts that (1) his removal was improperly based solely on failure to perform his duties, (2) he was denied due process in being removed, and (3) the trial court erred by not appointing Elliott's wife as successor personal representative.

2. Discussion

A. Jurisdiction and Standard of Review

(1) Jurisdiction

Appellee Hoge contends that since appellant Elliott appealed from the November 14, 2001, order rather than the November 30, 2001 amended order, he did not appeal a "final order" and therefore this court does not have jurisdiction to hear the appeal. See D.C.Code ง 11-721(a)(1). Hoge posits that a ruling on a pending motion by a trial court cures prematurity only where the court "later ruled upon the pending motion without modifying the judgment being appealed." Circle Liquors, Inc. v. Cohen, 670 A.2d 381, 385 n. 8 (D.C.1996). See also D.C.App. R. 4(a)(2) ("The running of time for filing a notice of appeal is terminated as to all parties by the timely filing of [a motion]. . . to amend the order.") Hoge contends Circle Liquors means that this court does not have jurisdiction to hear Elliott's appeal because the trial court modified the order from which Elliott appealed.
In Circle Liquors, the motion in question was a "Motion to Amend Judgment." Id. The timely filing of such a motion renders the judgment in the case non-final and that, in turn, denies this court jurisdiction to hear any appeal from that particular judgment. Dyer, supra, 635 A.2d at 1288. However, when a requested amendment "raises issues that are, for all practical purposes, `collateral to and separate from the decision on the merits,"' the order disposing of the merits remains appealable. Weaver v. Grafio, 595 A.2d 983, 986 (D.C.1991) (citing Budinich v. Becton Dickinson & Co., 486 U.S. 196, 200, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)). See Words, Inc. v. Singer, 810 A.2d 910 (D.C. 2002). Moreover, if the trial court later rules on "the pending motion without modifying the judgment being appealed," Circle Liquors, supra, 670 A.2d at 385 n. 8, the premature filing of the appeal does not divest this court of jurisdiction.
The charitable beneficiaries' motion to amend the order requested only the addition of explanatory material. It did not ask the trial court to modify either the portion of the judgment removing Elliott, or the portion of the judgment appointing Hoge. The motion merely sought an explanation *1002 as to why there was good cause for removing Elliott and for not appointing his wife as his successor. Therefore, the order Elliott appealed from was immediately appealable and remained so. See, e.g., Budinich, supra, 486 U.S. at 196, 108 S.Ct. 1717 (holding that a judgment disposing of the merits but leaving open the question of attorneys' fees is a final, appealable order); Weaver, supra, 595 A.2d at 983 (holding that judgment disposing of all issues except Rule 11 sanctions should be treated as immediately appealable). Since that is so, Elliott's appeal was not premature, and this court has jurisdiction.

(2) Standard of Review

In an appeal arising from a matter tried without jury, "we must decide independently whether the trial judge committed `errors of law,'" Hopkins v. Akins, 637 A.2d 424, 426-27 (D.C.1993), or "the judgment was plainly wrong or without evidence to support it." D.C.Code ง 17-305 (1989).

(i) Removal of a Personal Representative

Under D.C.Code ง 20-526(b), the trial court must remove the personal representative if it finds, after a hearing, that he or she has committed one of several infractions enumerated therein. We may not set aside a judgment of a trial court in a matter tried without jury except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it. D.C.Code ง 17-305. See Conner v. 1747 Pa. Ave. Assocs., L.P., 669 A.2d 693 (D.C.1995); Walker v. District of Columbia, 656 A.2d 722 (D.C.1995). Since the court has no discretion, but is statutorily bound to remove the personal representative if it finds that he or she has committed an infraction of a personal representative's fiduciary duties, we review only the finding of an infraction.

(ii) Appointment of a Personal Representative

By contrast, review of a trial court's appointment power should be conducted under an "abuse of discretion" standard since the Code allows the trial court to vary from the statutorily prescribed order of preference in appointing a successor personal representative. D.C.Code ง 20-303(d) (2001) (the court "may, for good cause shown, vary from the order of priority"). The decision on whom to appoint is therefore "committed to the discretion of the trial court and is reviewable by this court only for an abuse in its exercise." Johnson v. United States, 398 A.2d 354, 367 (D.C.1979).

B. Issues on Appeal

(1) Elliott's Removal

D.C.Code ง 20-526 states that "a personal representative shall be removed from office upon a finding by the Court that such representative: . . . (5) has failed, without reasonable excuse, to perform any material duty of such office." D.C.Code ง 20-526(a)(5) (2001). In its summary hearing order of November 14, 2001, the trial court found that appellant Elliott had not filed proper accounts and that he had not fulfilled his duties and responsibilities as the personal representative for the estate.
The record shows that Elliott had failed to perform his fiduciary duties in that he was extremely late in paying the taxes for the estate and his tardiness cost the estate substantial IRS penalties. At the hearing, the trial court noted that paying the taxes on time was an elementary fiduciary duty. Although, as explained above, Elliott attempted to defend his tardiness, the trial court found his excuse for the delay questionable at best. The trial court also noted that in managing the estate, Elliott had the assistance of both legal counsel and a *1003 tax expert which made his tardiness even less reasonable. We are satisfied that the trial court committed no error. There was a sufficient factual basis for the trial court's underlying factual determination that appellant Elliott had failed to perform a material duty of his office and that appellant Elliott had no reasonable excuse for that failure.

(2) Due Process in the Removal Process

Elliott claims he was denied notice and a hearing as required by due process, but the record demonstrates otherwise. He was notified, as required under Super. Ct. Prob. R. 121, that he faced removal if his failures to carry out his fiduciary duties were not corrected. He then requested and received at least one postponement of the summary hearing. Finally on the reset date of November 14, 2001, Elliott received a hearing on his removal. There was no violation of appellant Elliott's due process rights.

(3) Appointment of Successor Personal Representative

Hoge contends that once appellant Elliott was removed as personal representative, Elliott no longer had standing to contest the appointment of Hoge as successor personal representative. Under D.C.Code ง 11-721(b) (2001), only a party "aggrieved" may appeal from an order or judgment of a trial court. See also Super. Ct. Prob. R. 8(a) ("[a]ny person who is aggrieved" by an order or judgment and who participated in the trial court's determination may take an appeal). A person is "aggrieved" when that person's legal rights have been infringed or denied. In re C.T., 724 A.2d 590, 595 (D.C.1999). If a person has suffered no injury to his legal rights or to some legally protected relationship, he has no standing to appeal. In re Estate of Jacobson, 387 A.2d 590, 591 (D.C.1978). Although he remains an interested party (because he is still a legatee), appellant Elliott sustained no injury to his legal rights or to any legally protected relationship from the appointment of appellant Hoge as successor personal representative. An appeal may be dismissed if the appellant lacks standing as an aggrieved party. In re C.T., supra, 724 A.2d at 595. Since Elliott has no standing to appeal Hoge's appointment as successor personal representative, we dismiss Elliott's appeal of that portion of the November 14, 2001 summary order.
Therefore, the trial court's summary hearing order of November 14, 2001 is affirmed.

SECTION VI: SUMMARY
As to the order dismissing Valentine's renewed claims of forgery in the July 31 will and her claim to be Delaney's common law wife, we hold (1) that a challenger may use the discovery rule to bring a belated will contest based on intrinsic fraud, but that Valentine's attack on the will coming, as it did, three years after the will was admitted to probate, reflected a lack of diligence on her part and came too late, and (2) Valentine's assertion of common law wife status was statutorily time-barred. Therefore, we affirm the trial court's order of June 27, 1997, dismissing both the challenge to the will and the common law wife claim as time-barred.
As to the trial court's March 23, 1999, findings of fact and conclusions of law and its October 20, 1999 order of judgment, both of which related to the ownership of the two Virginia accounts, we affirm in all respects. Because Valentine abandoned them, we dismiss Valentine's appeals from the court's orders (1) denying her motion to intervene in Patton v. Elliott, (2) requiring payment of auditor's fees, and (3) denying a request for a stay of enforcement.
*1004 We also affirm the trial court's compensation orders as to Elliott (issued December 10, 1999) and Rosen (issued May 15, 2000), and the trial court's order of June 6, 2000, requiring Valentine to pay attorneys' fees to the Delaney estate and the charitable beneficiaries. Finally, we affirm in all respects the trial court's order of November 30, 2001, removing Elliott as personal representative and appointing Hoge as the successor.
So ordered.
NOTES
[1] This issue is also the subject of one of these consolidated appeals.
[2] In its order dismissing the fraud/forgery claim as time-barred, the trial court referred to D.C.Code ง 20-903(a)(1) as the "controlling statute." Section 20-903(a)(1) states:

(1) all claims against a decedent's estate, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract or other legal basis, shall be barred against the estate, the personal representative, and the heirs and legatees, unless presented within 6 months after the date of the first publication of notice of the appointment of a personal representative.
Thus, ง 20-903(a)(1) refers only to claims by creditors, not challenges to the validity of the will brought by heirs and legatees. In re Estate of Derricotte, 744 A.2d 535 (D.C.2000). Cf. District of Columbia v. Gantt, 558 A.2d 1120 (D.C.1989) (allowing claim against decedent husband's estate for care and maintenance of decedent's wife at public mental health hospital); In re Estate of Phillips, 532 A.2d 654 (D.C.1987) (allowing claim for attorneys' fees against estate). The court apparently intended to refer to D.C.Code ง 20-305, which we discuss below.
[3] This court does not have jurisdiction to hear an appeal unless the order appealed from is a final order. D.C.Code ง 11-721(a)(1) (1981). Appeal No. 97-PR-1217 was filed immediately after the entry of the trial court's June 27, 1997, order dismissing as time-barred appellant Valentine's renewed claims of forgery and her claim to be decedent's common law wife. Although the June 27 order was not the final order in Elliott v. Valentine, it might have been construed as final under the collateral order doctrine. Because the appeal has since ripened with the entry of final judgment in Elliott v. Valentine, we will not consider the applicability of the collateral order doctrine here.
[4] Although the terms "intrinsic fraud" and "extrinsic fraud" are sometimes employed loosely, "intrinsic fraud" is generally used to describe fraud which arises within the court proceeding and concerns an issue that speaks directly to a determination on the merits. Examples would be undue influence, fraud in obtaining the will and a forgery within the will. "Extrinisic fraud," however, usually refers to the manner in which a judgment is obtained and concerns matters not directly in issue. An example would be fraud practiced on a party to the proceeding which prevents him or her from presenting a case. See, e.g., In re Will of Evans, 46 N.C.App. 72, 264 S.E.2d 387, 389 (1980).
[5] We take note of few cases where courts have applied the statute of limitations for civil fraud, but also note that they were not will contests and did not involve allegedly forged or fraudulent wills. See, e.g., Succession of Hearn, 415 So.2d 215 (La.1982) (testator's daughter not provided with notice of probate proceedings because executrix filed false documents regarding existence of descendants); Schoen v. Burns, 321 So.2d 908 (La.App. 1975) (fraudulent concealment of existence of an heir).
[6] D.C.Code ง 20-305 states, "any person may file a verified complaint to contest the validity of a will within 6 months following notice by publication of the appointment ... of a personal representative." D.C.Code ง 20-305 (2001).
[7] The discovery rule has no application here. Appellant Valentine is not claiming that her delay in discovering that she might be Delaney's common law wife was caused by fraud or that facts about her relationship with Delaney, unknown to her during his lifetime, came to her attention well after his death.
[8] Oddly, on the day after the hearing, Valentine's counsel filed with the court a "Summary of Status of Pending Motions," in which he indicated that the January 23 hearing would deal with Elliott's motion for consideration of his motion for summary judgment. Valentine's counsel certified that he had served the summary on Elliott's counsel on the day of the hearing. Yet Valentine's counsel never mentioned the summary to the judge during the hearing. The circumstances raise the question of when the summary was prepared.
[9] The court indicated that it would rule later on the estate's contentions regarding the will (apparently referring to Valentine's challenge to the will) and to Valentine's standing to mount such a challenge.
[10] Valentine also claims there was a conspiracy among the probate clerk, the judges of the probate court and Elliott in violation of 42 U.S.C.1983, 1985 and 1986. This issue is being raised for the first time on appeal, and we need not consider it. Barrera v. Wilson, 668 A.2d 871 (D.C.1995). The only exceptions to this rule are extraordinary cases where the possibility of injustice exists. Wagshal v. District of Columbia, 430 A.2d 524 (D.C.1981). Arguments that have little, if any, merit are not sufficient to create an exception. Eastern Indem. Co. v. Content, 543 A.2d 1361, 1363 (D.C.1988). Appellant Valentine recites only unsupported allegations and provides no showing that she was entitled to use the funds that were placed into the court registry. Since no injustice will result from refusing to hear this belated ง 1983 claim, we decline to address it.
[11] Virginia's code states, "When any joint tenant dies . . . whether the estate is real or personal . . . his part shall descend to his heirs, or pass by devise, or go to his personal representative, subject to debts or distribution, as if he had been a tenant in common." VA. CODE ANN. ง 55-20.
[12] It seems clear that Virginia Code ง 6.1-125.5 applies to the credit union account. It is less clear whether Virginia Code ง 6.1-125.5 or ง 55-20 would apply to the Merrill Lynch account. This is because the Merrill Lynch account was a brokerage account in addition to being a cash management account, and brokerage accounts do not qualify as accounts for the purposes of ง 6.1-125.5 under ง 6.1-125.1(1) (the definitional section). VA. CODE ANN. งง 6.1-125.1 and 6.1-125.5. See also Bennet v. First & Merchants Nat'l Bank, 233 Va. 355, 355 S.E.2d 888, 891 (1987); Buck v. Jordan, 256 Va. 535, 508 S.E.2d 880, 883 (1998).
[13] See Barbara M. Rose, Multiple-Party Accounts: Does Virginia's New Law Correspond with the Expectations of the Average Depositor?, 14 U. RICH. L. REV. 851, 856 n. 29 (1980) (citing Report of the Multiple-Party Deposit Accounts Committee of the Virginia Bar Association, Meeting of September 18, 1978, at 2 (Sept. 18, 1978)).
[14] Id. at 865, 508 S.E.2d 880.
[15] Neither appellant nor any other party has argued that the District of Columbia's Uniform Nonprobate Transfer on Death Act, D.C.Code งง 19-601-603.11, adopted in 2001, applies to this case. Accordingly, we do not consider whether that statute might apply to the 1999 judgment at issue here, or, if it should apply, what its application would be.
[16] Super. Ct. Prob. R. 124 sets forth in detail the requirements of form and substance that a request for compensation must meet.
[17] The 1993 version of ง 20-751 was enacted June 24, 1980 and remained in effect until enactment of the current version of the probate statute. See Legislative History notes after D.C.Code งง 20-101, -751 (1993). Although the current version of ง 20-751 became law well before appellant Elliott filed his second request for compensation, it was part of the Probate Reform Act of 1994 which applied only to estates of decedents dying after July 1, 1995. See In re Estate of King, 769 A.2d 771, 777 n. 7 (D.C.2001). See also Probate Reform Act of 1994 Emergency Amendment Act of 1995, D.C. Act 11-79, 42 D.C.Reg. 3452 (1995). Delaney died on August 6, 1993.
[18] Super. Ct. Prob. R. 8(c)(2) now expressly provides that a determination of the rights of interested persons through construction of a will is a final order, but was not effective until February 1, 1997.
[19] These factors are now listed under ง 20-753, but they remain the same as those in force in 1993 when Delaney died and in 1994 when the Delaney estate entered probate. D.C.Code ง 20-753 (2001).
[20] Superior Court requires that time be recorded and compensated in increments not exceeding one-tenth of an hour. In re Estate of Torchiana, 121 Daily Wash. L. Rptr. 2477 (Super.Ct.1993). The ten percent reduction is used to penalize awards for time charged in quarter-hour increments. See In re Estate of Eskind, 122 Daily Wash. L. Rptr. 513 (Super.Ct.1994).
[21] This order was finalized in the trial court's judgment order of October 20, 1999.
[22] Item XVI of the July 31 will reads: "If any beneficiary or my Executor challenges my bequests, any amount due them will be cancelled and revert back to my estate, to be distributed to the above named charities."
[23] The probate code defines an interested person as "any legatee in being, whether such legatee's interest is vested or contingent, until the legacy is paid in full." D.C.Code ง 20-101(d)(1)(C) (2001).
[24] This stringency is consistent with the American Rule regarding attorneys' fees which requires each party to bear its own attorneys' fees. The American Rule serves to ensure that no individual will be deterred from bringing legal action for fear of losing and being forced to pay substantial legal fees for the other side. Rule 11 sanctions and a trial court's inherent sanctioning powers form a narrow exception to the American Rule.
[25] All these returns were eventually filed, and the corresponding taxes were paid, in 1999.